2016 OK CR 3

**Mica Alexander MARTINEZ, Appellant;**

**v.**

**The STATE of Oklahoma, Appellee.**

No. D–2013–673.

Court of Criminal Appeals of Oklahoma.

March 8, 2016.

🔑26(3)

An Appeal from the District Court of Comanche County; the Honorable Mark R. Smith, District Judge.

Craig Corgan, Perry Hudson, Oklahoma City, OK, Attorneys for Defendant at trial.

Eddie Valdez, Mark Stoneman, Asst. District Attorneys County Courthouse, Lawton, OK, Attorneys for the State at trial.

James H. Lockard, William H. Luker, Norman, OK, Attorneys for Appellant on appeal.

E. Scott Pruitt, Attorney General, Jennifer L. Crabb, Asst. Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

### *OPINION*

LEWIS, Judge.

¶1 Mica Alexander Martinez, Appellant, was tried by jury and found guilty of Counts 1 and 2, murder in the first degree, in violation of 21 O.S.Supp.2009, § 701.7(A); and Count 3, assault and battery with a dangerous weapon, in violation of 21 O.S.Supp.2006, § 645, in Comanche County District Court, Case No. CF–2009–473. The jury found two statutory aggravating circumstances[1] and sentenced Appellant to death in Counts 1 and 2, and ten (10) years imprisonment in Count 3. The Honorable Mark R. Smith, District Judge, pronounced judgment and sentence accordingly. Mr. Martinez appeals.

### *FACTS*

¶2 Carl and Martha "Faye" Miller lived five miles south of Cache, Oklahoma, on State Highway 115 and Woodlawn Road. Around 4:49 a.m. on Monday, October 12, 2009, Ms. Miller called 911 to report shots being fired from a vehicle parked near her residence. She could only describe the vehicle as having its lights on. Ms. Miller asked police to come quickly, saying that "We opened the garage door, and they saw me standing there with the telephone." Two officers were dispatched to the scene.

¶3 A short time later, another motorist also called 911 to report an abandoned vehicle facing east in the westbound lane of Woodlawn Road at the intersection of Highway 115. The two deputies soon arrived and found the reported vehicle, with no one inside. The keys were still in the vehicle's ignition and its cabin lights were on. After seeing loose rounds of high-powered ammunition inside, the deputies turned off their vehicle lights and got a shotgun, an assault rifle, and night vision equipment.

¶4 As the deputies scanned the area, they received a third dispatch, to a burglary in progress at a house just across Highway 115, a few hundred feet from the abandoned vehicle. As they approached the house, deputies heard a struggle. They knocked at the back door and demanded entry. Just before they broke in, Shawn Monk unlatched and opened the door. The deputies found Shawn Monk and the Appellant inside and quickly detained them.

¶5 The kitchen floor where the two men had been fighting was slick with a mixture of blood and water, which was pouring from a broken refrigerator line. Shawn Monk was badly injured with bleeding wounds to his head. Appellant repeatedly said "I'm sorry," and eventually told the officers that Monk lived at the house. The officers also saw a Winchester .30–30 rifle lying on the kitchen floor. Monk told the deputies the rifle belonged to Appellant. Monk also told the deputies that his parents were injured and needed help.

¶6 Shawn Monk later testified at trial that he had spent Sunday night with his parents, Carl and Faye Miller, and slept in a guest bedroom. He awoke early the following morning to loud noises and voices. He first thought his father might have fallen asleep with the television on. He heard a loud, unfamiliar voice say "Where's the money, bitch?" A short time later, he heard a voice

---

1. The defendant knowingly created a great risk of death to more than one person; and the murders were especially heinous, atrocious, or cruel. 21 O.S.2001, §§ 701.12(2), (4).

say "You like my dick in your ass, don't you?" Monk was now alarmed and got up. The lights in the hallway were turned on. He screamed down the hallway, "What the fuck is going on?"

¶ 7 Monk then saw a stranger step into the hallway from his parents' bedroom and walk away from him toward the living room area. He followed the intruder, pausing at his parents' bedroom long enough to see his mother lying on the bed, face down, her pants around her ankles, still breathing but obviously injured. Appellant was looking in the garage as Mr. Monk stepped into the living room. Appellant attacked him. As the Appellant and Monk fought, Monk pleaded with Appellant to let him get help for his parents.

¶ 8 Appellant eventually relented and sat down in the floor, saying "I fucked up, I'm sorry. My friends fucked him up," referring to Carl Miller. Shawn Monk looked in the garage and saw his father lying on the floor, still breathing but also obviously injured. Monk also picked up the .30–30 lever action rifle he saw lying on the floor, determined it was unloaded, and called 911. Appellant sat in the floor for a few minutes, then got up and threw a barbell at Shawn Monk, striking the phone he was using to call 911. Appellant then wrestled the rifle from Mr. Monk and gashed his head with several blows from the butt of the rifle. Mr. Monk was still fighting with Appellant when he opened the door and deputies entered the home.

¶ 9 Emergency responders transported Carl and Faye Miller to local hospitals, where both later died of their injuries. Faye Miller suffered extensive bruising to her face and upper body, arms, inner thighs, and legs. Blunt force head trauma caused bleeding and bruising to her scalp, a subarachnoid hemorrhage, and a large subdural hematoma with midline shift of the brain. She also sustained traumatic injuries to her vagina and anus consistent with forcible sexual assault. Carl Miller's wounds included blunt force head trauma with several scalp lacerations, a 7 cm. skull fracture, subarachnoid hemorrhage, and contusion of the temporal lobe. Mr. Miller also suffered bruising and scraping of his arms.

¶ 10 Appellant's father testified that Appellant borrowed his .30–30 Winchester rifle and a box of ammunition and left to go hog hunting early in the morning of October 12, 2009. He learned a few days later that Appellant had been arrested. When Appellant was searched at the crime scene, the deputies recovered Carl Miller's wallet and a set of keys belonging to Shawn Monk. They also recovered Appellant's sweatshirt and t-shirt in the Millers' bedroom. Appellant's jeans were stained with blood, which was eventually matched to all three victims by DNA comparisons. Carl Miller's blood was found on Appellant's shoe.

¶ 11 Appellant did not testify at trial. In his first written and taped statements to police on the morning of his arrest, he claimed that a friend named D.J. attacked the victims. Police later identified "D.J." and confirmed his alibi for the morning of the crimes. In a second interview several days after the crimes, Appellant then told investigators the murders were committed by a hitchhiker.

¶ 12 At trial, defense counsel acknowledged that Appellant had killed the victims, but argued that the unplanned nature of the crimes and Appellant's intoxication created a reasonable doubt of the element of malice aforethought. Further facts will be discussed in connection with the propositions of error.

## ANALYSIS

¶ 13 In Proposition One, Appellant argues that the State's failure to promptly obtain and test his blood sample for alcohol concentration and subsequent "exploitation" of that failure at trial violated due process. He argues that investigators acted in bad faith by "waiting" more than twelve hours after the crimes before drawing blood, depriving him of exculpatory evidence of voluntary intoxication. Appellant also argues that even absent bad faith, the combination of extreme negligence by investigators in collecting his blood, and its resulting prejudice to his defense, requires reversal.

¶ 14 Appellant failed to object on this ground at trial, and failed to object to

the admission of other evidence of his blood alcohol concentration. We therefore review this claim only for plain error. *Simpson v. State,* 1994 OK CR 40, ¶ 2, 876 P.2d 690, 692–93. To obtain relief, Appellant must prove a plain or obvious error affected the outcome of the proceeding. *Hogan v. State,* 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. Even where plain error is shown, this Court will remedy the error only if it seriously affects the fairness, integrity, or public reputation of the proceedings or represents a miscarriage of justice. *Murphy v. State,* 2012 OK CR 8, ¶ 18, 281 P.3d 1283, 1290.

¶ 15 Trial evidence and testimony indicate that Appellant was a problem drinker, and had been drinking on the morning he committed these crimes. Around 3:30 a.m., Appellant had stopped by the home of two friends and asked them to go hog hunting. They testified that Appellant said he had a bottle of rum; that he smelled of alcohol, and was slurring his speech. After borrowing a spotlight, Appellant left their house. He called a third friend around 4:00 a.m., who later testified that Appellant sounded intoxicated on the phone.

¶ 16 The arresting officer noticed an odor of alcohol when he encountered Appellant at the crime scene. Another investigator confirmed that Appellant smelled of alcohol some two hours later during an interview. Appellant claimed to police that he had been drinking and briefly passed out in his truck before the crimes, but no empty bottles or cans of alcohol were recovered from the vehicle. Appellant also presented expert testimony of his alcoholism and his probable level of intoxication during the crimes, citing physical evidence that Appellant had defecated in his pants and attempted to clean himself off near the intersection across from the victims' house.

¶ 17 When an investigator first requested that Appellant provide a blood sample, at around 10 a.m. on the morning of his arrest, Appellant refused. Police eventually obtained a warrant for the blood draw, which was executed around 6:35 p.m. The State presented testimony at trial that Appellant's blood alcohol concentration from this sample showed no detectable alcohol, and that Appellant's blood alcohol level at the time of the crimes was unknown.

 ¶ 18 The preliminary question on plain error review is whether error, an actual violation of law, has plainly or obviously occurred. *Murphy,* 2012 OK CR 8, ¶ 19, 281 P.3d at 1290. Under Oklahoma law, "[n]o act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition," 21 O.S.2001, § 153; and "[h]omicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." 21 O.S.2001, § 704. Voluntary intoxication may reduce criminal homicide from first degree murder to second degree murder or first degree manslaughter; but only when the defendant is "so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent ... element of the crime." *Grissom v. State,* 2011 OK CR 3, ¶ 38 n. 13, 253 P.3d 969, 983 n. 13 (*quoting McElmurry v. State,* 2002 OK CR 40, ¶ 72, 60 P.3d 4, 23).

 ¶ 19 The Supreme Court has held that regardless of the good or bad faith of the State and its agents, the prosecution's suppression or non-disclosure of material exculpatory evidence violates a defendant's right to due process of law. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Official destruction of evidence, when its exculpatory significance is apparent before destruction can also violate due process, when it leaves the defendant unable to "obtain comparable evidence by other reasonably available means." *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984).

¶ 20 In *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court held that a different rule would apply where the State destroys or fails to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57, 109 S.Ct. at 337. "Unless a criminal defendant can show bad faith on the part of the

police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58, 109 S.Ct. at 337.

¶ 21 The Supreme Court in *Youngblood* reversed a lower court ruling that the State violated the rights of a defendant convicted of child abduction and rape by its destruction or failure to preserve serological samples. 488 U.S. at 54–55, 109 S.Ct. at 335–36. Though the lost evidence might have excluded the appellant as the perpetrator, the Court found police had collected the samples according to usual practice, and the failure to preserve the samples and conduct prompt testing was, at worst, negligent. 488 U.S. at 58, 109 S.Ct. at 337–38.

¶ 22 In *Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004), the Supreme Court again reversed a lower court ruling that the State's destruction of potentially useful evidence violated due process. In *Fisher*, the defendant filed a discovery motion seeking access to alleged controlled drugs for independent testing. He then absconded and remained at large for ten years. Upon his arrest, he renewed his request for the evidence, which had been destroyed in the meantime according to standard procedure. 540 U.S. at 545–547, 124 S.Ct. at 1200–01.

¶ 23 At trial, the State presented evidence that four tests on the substance indicated the presence of controlled drugs, and Fisher was convicted. The state appellate court reversed, finding destruction of the remaining evidence violated due process under *Youngblood.* The state court held the appellant's pending discovery request put the State on notice of appellant's desire to access the evidence; and that *Youngblood's* bad faith showing was unnecessary where a favorable test was the "only hope of exoneration" and "determinative of the outcome." 540 U.S. at 548, 124 S.Ct. at 1202. The Supreme Court granted certiorari.

¶ 24 The Supreme Court held that neither the pending discovery request, nor the "centrality" of the evidence to the prosecution's case or the defendant's defense, vitiated the showing of bad faith required by *Youngblood.* The bad faith requirement rested instead on the distinction between material exculpatory (i.e., *Brady/Trombetta* ) evidence and potentially useful (i.e., *Youngblood* ) evidence. *Fisher,* 540 U.S. at 549, 124 S.Ct. at 1203. Police testing of the substance in *Fisher* had actually inculpated the defendant; the most he could hope was that another test would exonerate him. The loss of such "potentially useful evidence" was governed by *Youngblood's* bad faith destruction rule, not *Brady's* stricter suppression rule for material exculpatory evidence. 540 U.S. at 549, 124 S.Ct. at 1203.

¶ 25 This Court followed *Youngblood* in *Hogan v. State,* 1994 OK CR 41, 877 P.2d 1157, rejecting a capital defendant's claim that the State's destruction of vials of the victim's blood violated due process. The defendant claimed testing would have supported his claim that he and the victim smoked marijuana laced with an unknown drug. The Court found that although the State had agreed to perform further testing, the vials previously available for testing had been inadvertently destroyed. Because the defendant in *Hogan* failed to show bad faith, the Court found no due process violation. *Id.,* 1994 OK CR 41, ¶¶ 17–18, 877 P.2d at 1161.

¶ 26 In *Gilson v. State,* 2000 OK CR 14, 8 P.3d 883, the Court rejected a capital defendant's claim that the State violated due process when it failed to videotape and preserve every interview with several child witnesses, allegedly depriving the defendant of evidence of suggestive interviewing techniques. *Id.,* 2000 OK CR 14, ¶ 51, 8 P.3d at 905. The Court declined to hold that due process "mandate[d] that every interview conducted with a child victim be taped because it may potentially be exculpatory." 2000 OK CR 14, ¶ 57, 8 P.3d at 906. The defense received either summaries or copies of the available interviews, and was able to explore allegedly suggestive interviewing through cross-examination of the interviewers. Because defendant had not shown that the State acted in bad faith by failing to tape and preserve *all* interviews, no due process violation occurred. *Id.*

[7, 8] ¶ 27 Within the context of these controlling principles, we must determine whether the investigators' failure to obtain and test Appellant's blood sample for alcohol concentration, closer to the time of the crimes than they did, violated due process of law. Due process does not impose on the State or its agents "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Ochoa v. State*, 1998 OK CR 41, ¶ 26, 963 P.2d 583, 595 (*quoting Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337). We therefore reiterate that unless a defendant can show bad faith, the State's destruction of potentially useful evidence does not constitute a due process violation.

■ ¶ 28 Investigators here did not *destroy* blood samples like the officials in *Hogan*. They simply did not collect and preserve a blood sample within the time that Appellant now speculates could have been helpful. The facts are more comparable to *Gilson*, where we rejected the claim that police should have recorded and preserved interviews, but did not. Appellant effectively asks us to recognize a *new* "constitutional duty to collect and preserve" all potentially useful defense evidence. We find no justification for this broader obligation under current state or federal constitutional due process. *Ochoa*, 1998 OK CR 41, ¶ 26, 963 P.2d at 595 (rejecting a higher standard and finding case controlled by *Hogan* and *Youngblood); United States v. Marrero*, 904 F.2d 251, 261 (5th Cir.1990) (*Brady* places no obligation on government to conduct defendant's investigation or assist in the presentation of a defense).

■ ¶ 29 We also find no evidence of bad faith by investigators, in the sense that collection of Appellant's blood was "intentionally delayed to gain some tactical advantage" in the prosecution. *Youngblood*, 488 U.S. at 57, 109 S.Ct. at 337. Appellant himself created some delay when he refused to give a blood sample around 10 a.m. on the morning of his arrest. Even then, it was hardly evident that a test of Appellant's blood alcohol concentration "would have enabled the defendant to exonerate himself" in these crimes.

*Id.* at 56, 109 S.Ct. at 336. At most, such evidence was "an avenue of investigation that might have led in any number of directions." *Id.* at 56 n. *, 109 S.Ct. at 336 n. *. These facts fall considerably short of the bad faith destruction of potentially useful evidence prohibited by *Youngblood*.

■ ¶ 30 Finally, even assuming that the failure to promptly collect a blood sample was error, the error did not affect the outcome at trial. The State did not suppress or destroy evidence that Appellant consumed alcohol. Officers testified that Appellant smelled of alcohol that morning; other lay and expert testimony indicated that Appellant was an alcoholic who was possibly impaired at the time of the crimes. The countervailing evidence (including the sustained manner of the attacks; the severity and multiplicity of injuries to multiple victims; Appellant's fabrications, attempts to implicate others, and ability to recall details about the crime scene) strongly indicated that Appellant's mental powers were not so overcome by intoxication that he was unable to form malice aforethought.

¶ 31 The State did not deny Appellant had been drinking, but argued that anger, rather than alcoholic oblivion, was the major factor in the crimes. Appellant was able to argue that intoxication and other facts raised a reasonable doubt of malice aforethought; and that that the failure to preserve better intoxication evidence was incompetent or biased police work. "[B]ut the police do not have a constitutional duty to perform any particular tests." *Youngblood*, 488 U.S. at 59, 109 S.Ct. at 338. Appellant has therefore failed to show that a plain or obvious error affected the outcome of the trial. Proposition One is denied.

■ ¶ 32 In Proposition Two, Appellant claims the evidence is insufficient to support his convictions for first degree murder. He admits having unlawfully caused the victims' deaths, but argues that the evidence fails to show the essential element of malice aforethought. On appeal, this Court reviews the evidence admitted at trial to determine whether, "in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime charged beyond a reasonable doubt." *Young v. State*, 2000 OK CR 17, ¶¶ 34–35, 12 P.3d 20, 35 (*citing Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203).

¶ 33 Malice aforethought may be "manifested by external circumstances capable of proof." 21 O.S.Supp.2009, § 701.7. The design to effect death or intent to kill may be inferred from the fact of killing itself, "unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S. 2001, § 702. In the light most favorable to the prosecution, the evidence here shows an unprovoked, early morning attack on the victims in their rural home. Appellant carried his rifle across the road and entered through their garage, probably after seeing they had reported him for shooting nearby.

¶ 34 He apparently subdued Carl Miller in the garage with several blows, most likely with the rifle butt, causing large gashes to Miller's head and internal trauma to his brain. He then followed Faye Miller into the home, beat her head and face severely with his hands or fists, and was sexually assaulting her when he heard Shawn Monk calling out. When he saw Shawn Monk, Appellant immediately attacked him, briefly relented, and eventually bludgeoned and beat Monk until officers arrived. Any rational trier of fact could find beyond a reasonable doubt that Appellant killed the victims with malice aforethought. Proposition Two is denied.

¶ 35 Proposition Three argues that the trial court committed plain error by admitting irrelevant and unduly prejudicial testimony about the chemical testing of Appellant's blood. OSBI Criminalist Jerry Carter testified for the State that Appellant's blood, drawn more than twelve hours after the crimes at 6:35 p.m., tested negative for the presence of drugs and alcohol. Carter also stated that Appellant's blood might have been free of intoxicants at the time of the crime, but this could not be known from the testing.

¶ 36 Because Appellant failed to object to the testimony at trial, we again review for plain error, as discussed in Proposition One. Appellant argues that because the sample was obtained more than twelve hours after the crimes, it was not relevant to the issue of Appellant's intoxication, or its relevance was substantially outweighed by the danger of unfair prejudice. We must first determine whether Appellant can establish a plain or obvious violation of controlling law; here, the rules of relevance in the Oklahoma Evidence Code.

¶ 37 Relevant evidence is evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.2001, § 2401; *Taylor v. State*, 2011 OK CR 8, ¶ 40, 248 P.3d 362, 375–76. It need not conclusively or directly establish guilt if, when taken with other evidence in the case, it tends to establish a material fact in issue. *Id.* Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or needless presentation of cumulative evidence. Relevancy and materiality of evidence are matters within the sound discretion of the trial court. *Grissom*, 2011 OK CR 3, ¶ 58, 253 P.3d at 989.

¶ 38 Appellant sought to show his intoxication at the time of the crimes through a variety of evidence. He argues the chemical test result was irrelevant, misleading, and unduly prejudicial because its remoteness from the crimes made it impossible to infer his level of intoxication. We find that evidence of the blood test result was relevant to show the State's overall collection of evidence and investigation which, along with other evidence, tended to establish guilt. *Patton v. State*, 1998 OK CR 66, ¶¶ 72–74, 973 P.2d 270, 293 (drawing of unknown shoe print obtained from luminol test properly admitted in murder trial to show thorough investigation). Although the test result was not highly probative of Appellant's intoxication more than twelve hours earlier, this was an issue for cross-examination regarding the weight of the evidence. The evidence did not mislead the jury, and was not unduly prejudicial or cumulative. Appellant has not shown plain or obvious error in the admission of the test result. Proposition Three is denied.

■■ ¶ 39 Appellant argues in Proposition Four that the trial court erred in the admission of photographic evidence. Appellant's objections to individual photographs at trial were overruled. The trial court's admission or exclusion of evidence over a timely objection or offer of proof is ordinarily discretionary and will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Hancock v. State*, 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813. An abuse of discretion is a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *C.L.F. v. State*, 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946.

■■ ¶ 40 Appellant first argues the admission of a photograph of the homicide victims, taken together as a couple during their lives, was reversible error. He argues the statute authorizing such a photo in a homicide prosecution without balancing its relevance against the potential for unfair prejudice or other countervailing factors violates due process of law. He also argues that the prosecutor denied him a fair trial when he showed the photograph to jurors in opening statement; and that his death sentence must be vacated because this improper evidence was incorporated in the second stage of trial.

¶ 41 By a 2002 amendment, the Legislature made a live photograph relevant and admissible in a homicide trial when offered "to show the general appearance and condition of the victim while alive." 12 O.S.2011, § 2403; *Stouffer v. State*, 2006 OK CR 46, ¶ 101, 147 P.3d 245, 268. The photograph must be "appropriate;" and if its relevance is substantially outweighed by the danger of unfair prejudice or other section 2403 factors, the court may exclude it. *Coddington v. State*, 2006 OK CR 34, ¶ 56, 142 P.3d 437, 453.

¶ 42 We rejected almost identical constitutional challenges to section 2403's photograph rule in *Coddington*, 2006 OK CR 34, ¶¶ 55-56, 142 P.3d at 452, ultimately finding the trial court's admission of a photograph of the victim in life was appropriate to show his general appearance; and that the appellant "was not deprived of a fair trial or a fair sentencing proceeding as a result." *Id.*, 2006 OK CR 34, ¶ 58, 142 P.3d at 453. The photo-graph here was appropriate and properly admitted under the statute. No relief is warranted.

■ ¶ 43 Appellant further complains that the prosecutor erroneously showed the challenged photograph to the jury in opening statement, before its identification and admission in evidence. This display apparently passed without objection, waiving all but plain error, as defined above. Without citing earlier authority, the Court disapproved the prosecutor showing items of potential evidence in opening statement in *Cheatham v. State*, 1995 OK CR 32, ¶ 31, 900 P.2d 414, 424, but did not reverse the conviction.

¶ 44 Citing *Cheatham*, the Court again found error in *Bell v. State*, 2007 OK CR 43, ¶ 13 172 P.3d 622, 627, where the prosecutor's computer presentation in opening statement included photographs of potential evidence. The error in both cases was harmless, as the evidence was later admitted and its depiction in opening statement was consistent with its content at trial. Neither defendant could show any conceivable prejudice from the prosecutor's display in opening statement of items later properly admitted in evidence. *Cheatham, id.; Bell, id.*

¶ 45 We reach the same conclusion here, because the photograph of the victims shown in opening statement was promptly identified and offered in evidence during trial; its prejudicial impact was negligible in light of the remaining evidence; and its depiction in opening statement was consistent with its content at trial. If the prosecutor's use of this potential evidence in opening statement could even be termed an error, it is certainly not unfairly prejudicial, and requires no relief.

■ ¶ 46 Appellant's remaining arguments challenge the trial court's admission of pictures depicting the victims' respective injuries. The trial court overruled Appellant's objections to the exhibits, and we review these rulings for abuse of discretion. Photographs may be probative of the nature and location of wounds; may corroborate the testimony of witnesses, including the medical examiner; and may show the nature of the crime scene. *Browning v. State*, 2006 OK

CR 8, ¶ 32, 134 P.3d 816, 837. Gruesome crimes make for gruesome photographs, but the issue is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or needless presentation of cumulative evidence. *Pavatt v. State*, 2007 OK CR 19, ¶ 55, 159 P.3d 272, 290, 12 O.S.2001, §§ 2401–2403.

[23] ¶ 47 State's Exhibit 6 depicted injuries to Shawn Monk's head and face before it was cleaned, showing a large amount of blood. State's Exhibits 84–86 depicted injuries to Carl Miller's head. State's Exhibit 89 depicts injuries to Faye Miller's face, while State's Exhibit 93 depicts injuries to her vagina. Appellant complains that this exhibit was unfairly prejudicial because the opening of the vaginal canal to permit an image of the injuries, and the inclusion of a ruler in the image, was unfairly prejudicial.

¶ 48 We find no abuse of discretion in the trial court's admission of these exhibits. All were probative of the disputed issue of Appellant's intent to kill the victims, corroborative of other lay and expert testimony, and germane to the issues of guilt and punishment. Proposition Four is denied.

¶ 49 In Proposition Five, Appellant challenges the trial court's admission of certain testimony over hearsay objections by the defense. The State agrees that the statements in question were hearsay, but claims the testimony was admissible under a hearsay exception or did not rise to the level of plain or obvious error. Appellant first challenges statements attributed to Shawn Monk in the testimony of Deputy Miles. Miles testified that shortly after entering the crime scene and securing Appellant and Shawn Monk that morning, Shawn Monk told him how he was startled awake by loud voices, then heard someone say "Gimme your wallet!" and "You like that, bitch. You like it in the ass."

¶ 50 Section 2803(2) of the Evidence Code provides that a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the startling event or condition" is not excluded by the hearsay rule. 12 O.S. 2011, § 2803(2). An excited utterance must meet three foundational requirements: (1) a startling event or condition; (2) a statement relating to that startling event or condition; (3) made while the declarant is under the stress of excitement caused by the startling event or condition. *Slaughter v. State*, 1997 OK CR 78, ¶ 36, 950 P.2d 839, 852.

¶ 51 We examine both the timing of the statement and its spontaneity on a case-by-case basis. *Marquez v. State*, 1995 OK CR 17, ¶ 15, 890 P.2d 980, 984. "Whether a statement qualifies as an excited utterance depends not on a fixed time but on the facts and circumstances." *Williams v. State*, 1996 OK CR 16, ¶ 17, 915 P.2d 371, 379. An excited utterance "need not be substantially contemporaneous with the startling event or condition ... so long as the declarant is under the stress of excitement at the time the statement is made." *Rawlings v. State*, 1987 OK CR 135, ¶ 74, 740 P.2d 153, 163.

¶ 52 Deputy Miles first encountered Shawn Monk when Monk opened the door to the home, and was still partially engaged in the struggle with the Appellant. The deputies entered and briefly secured both Appellant and Shawn Monk in handcuffs, while sweeping the house and trying to locate and assist the injured victims. After the house was secured, Monk was released from restraints. While Monk was still being treated for his head injuries by emergency personnel at the scene, Deputy Miles asked Mr. Monk what had happened, and received the responses related in trial testimony. Considering the timing and circumstances of Monk's statements to Deputy Miles, made while Monk was still under the evident stress of these startling events, we find these excited utterances were properly admitted. *Rawlings*, 1987 OK CR 135, ¶ 75, 740 P.2d at 163.

¶ 53 Appellant also challenges the admission of the autopsy report during testimony from the medical examiner, and the report of a sexual assault nurse examiner concerning examination of Faye Miller. Defense counsel objected at trial that the reports were repetitive and vouching. Appellant waived any objection based on the hearsay rule, and we review only for plain error, as defined above. *Myers v. State*, 2006 OK CR 12, ¶ 27, 133

P.3d 312, 324 (when trial objection differs from argument on appeal, review is limited to plain error). The State contends that while these exhibits were not admissible under the hearsay rule, their admission was not plain error.

▮ ¶ 54 The medical examiner's report was hearsay, and should not have been admitted absent a pertinent hearsay exception. *Cooks v. State*, 1985 OK CR 48, ¶ 28, 699 P.2d 653, 659 (1985). However, the report summarized the findings of the medical examiner, who testified at trial. Appellant does not dispute that he killed the victims or question the accuracy of the reports. The hearsay was thus cumulative to proper testimony and caused no prejudice. Appellant's only argument that he was prejudiced by the sexual assault nurse examiner's report is that it mentions a dark hair recovered from Faye Miller's rectal area. Given the undisputed evidence that Appellant sexually assaulted Ms. Miller, this evidence could not have affected the outcome. *Cooks, id.* (admission of autopsy report was harmless error). Proposition Five requires no relief.

▮ ¶ 55 In Proposition Six, Appellant seeks reversal or modification of his convictions or sentences due to prosecutorial misconduct. Relief will be granted for prosecutorial misconduct only where it effectively deprives the defendant of a fair trial or sentencing. *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶ 96, 241 P.3d 214, 243. We evaluate prosecutorial conduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence and the corresponding arguments of defense counsel. *Hanson v. State*, 2009 OK CR 13, ¶ 18, 206 P.3d 1020, 1028.

▮ ¶ 56 Appellant first argues the prosecutor committed misconduct in presenting evidence and argument on the issue of intoxication. Appellant limited his objection at trial to the prosecutor's use of records indicating Appellant's childhood toileting problems as a possible explanation for Appellant having defecated on himself the morning of the crimes. In this context, we find no reversible error. The prosecutor is an advocate, and may properly seek to minimize evidence presented by the defense, especially on the critical disputed issues in the trial. *Warner v. State*, 2006 OK CR 40, ¶ 192, 144 P.3d 838, 891. Reviewing the remainder of the prosecutor's presentation on the issue of intoxication for plain error, we find none.

▮ ¶ 57 Appellant also argues that the prosecutor committed misconduct in second stage by commenting on Appellant's decision to call his children as mitigation witnesses; saying that Appellant was a bouncer; and arguing Appellant had started bossing people around and bullying at a young age. Appellant failed to object to these comments, waiving all but plain error. Counsel are entitled to liberal freedom of speech in argument. *Frederick v. State*, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 946. Reversal is required only where grossly improper and unwarranted argument affects a defendant's rights. *Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556.

▮ ¶ 58 The prosecutor's comments regarding the position in which Appellant had placed his children by calling them as witnesses urged the jury to avoid a purely emotional reaction to the mitigation evidence, and did not exceed the bounds of proper argument. The remaining arguments were fair comments on the evidence and the appropriateness of the death sentence. Appellant has not shown any plain or obvious error that affected the outcome of the trial in the prosecutor's conduct. Proposition Six is denied.

▮ ¶ 59 In Proposition Seven, Appellant argues that testimony about his use of racial epithets during a fight violated his constitutional right to freedom of speech and denied him a fair sentencing proceeding. In the sentencing phase of trial, Appellant's former girlfriend testified that while she was with Appellant one night, he jumped from the car and got into a fight with two African American men. When he returned to the car, Appellant explained to her that "those two n* * *ers said they were going to rape you."

▮ ¶ 60 After this testimony, defense counsel moved for a mistrial, noting that two African Americans were on the jury. The

trial court overruled the motion and instead admonished the jury to disregard "any racial comments that were just made." Appellant first argues that the racial comments were an evidentiary harpoon. We disagree. An evidentiary harpoon occurs when an experienced police officer makes a voluntary, willfully jabbed statement injecting other crimes, which is both calculated to prejudice, and actually prejudicial to, the rights of the defendant. *Robinson v. State* 1995 OK CR 25, ¶ 47, 900 P.2d 389, 402–3. The witness here was not a professional witness, and did not inject inadmissible evidence of other crimes. Most importantly, the trial court's prompt admonition cured any error from this fleeting remark. *Smith v. State*, 2013 OK CR 14, ¶ 38, 306 P.3d 557, 571 (absent contrary evidence, admonition cures evidentiary error).

■ ¶ 61 Appellant next argues that this testimony violated his First and Fourteenth Amendment rights. He relies on *Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), where the Supreme Court held the admission of capital sentencing evidence that defendant belonged to the Aryan Brotherhood, where such evidence had "no relevance to the issues being decided in the proceeding," was constitutional error. 503 U.S. at 160, 112 S.Ct. at 1095. The evidence in *Dawson*, though not inadmissible *per se*, *id.* at 165, 112 S.Ct. at 1097, was irrelevant because the victim and defendant were both white; the evidence contained no link between gang membership and the crime; and it proved nothing more than the defendant's abstract beliefs. *Id.* at 166–67, 112 S.Ct. at 1098.

■ ¶ 62 We find no violation of *Dawson*. The Constitution erects no "*per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." 503 U.S. at 165, 112 S.Ct. at 1097. The *Dawson* Court acknowledged that such evidence "might serve a legitimate purpose in showing that a defendant represents a future danger to society," because a belief or association "that endorses the killing of any identifiable group, for example, might be relevant to ... whether the defendant will be dangerous in

the future." *Id.* at 166, 112 S.Ct. at 1098. The evidence challenged in *Dawson* was presented by a stipulation and, in the Supreme Court's view, "employed simply because the jury would find ... [it] morally reprehensible." *Id.* at 167, 112 S.Ct. at 1098.

¶ 63 By contrast, Appellant's use of racist language in this case was unexpectedly interjected by a lay witness, and the jury was immediately instructed to disregard it. The State maintained no link between this evidence and the murders or aggravating factors; it was not unconstitutionally "employed" at all. Though Appellant's racially motivated violence was arguably relevant to the continuing threat aggravating circumstance, the jury rejected that circumstance. We find no violation of Appellant's free speech rights under *Dawson;* and the evidentiary error, if any, was cured by the trial court's instruction. Proposition Seven is therefore denied.

¶ 64 Proposition Eight argues that the death sentences must be reversed or modified due to admission of improper victim impact evidence by the victims' two daughters. He also argues that victim impact testimony generally operates as a unconstitutional "super aggravator." Appellant's failure to object to the testimony at trial on these grounds waived all but plain error. *Simpson*, 1994 OK CR 40, ¶ 2, 876 P.2d at 692–93. We therefore initially consider whether any plain or obvious violation of law occurred in the admission of this testimony. *Murphy*, 2012 OK CR 8, ¶ 18, 281 P.3d at 1290.

■ ¶ 65 Evidence about the victim, physical effects of the crime, the circumstances surrounding the crime and the manner in which it was perpetrated, and the financial, emotional, psychological, and physical impact of the murder on the victims' family is admissible in capital sentencing. 21 O.S.2001, § 701.10(C); 22 O.S.2001, § 984; *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 68, 241 P.3d at 236. Appellant complains that the victims' testimony here improperly emphasized the crimes' impact on their emotional lives, including evidence that the trauma had been responsible for weight gain, high blood

pressure, diabetes, insomnia, and additional medications.

[43] ¶ 66 We rejected an almost identical challenge in *Cuesta–Rodriguez*, where the defendant contended that the victim impact testimony "focused exclusively on the emotional and psychological impact of the loss of their mother and was therefore too emotionally charged to be admissible." 2010 OK CR 23 at ¶ 66, 241 P.3d at 236. The victims in *Cuesta–Rodriguez* testified of nightmares reliving the scene of the murder; the difficulty of telling children about the crime; of facing holidays, pregnancy, and motherhood without their mother. We see no significant difference in either the scope or magnitude of the testimony given in that case and the type of evidence offered here. We have also previously rejected the broader claim that victim impact testimony is an impermissible super-aggravator, and do so again. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 71, 241 P.3d at 236 (citing cases). Appellant has not shown a plain or obvious violation of state or federal law in the admission of this evidence. Proposition Eight is denied.

■ ¶ 67 We also reject Appellant's claim, in Proposition Nine, that the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad. The current uniform instructions defining this aggravating circumstance are sufficient to meaningfully narrow the sentencing jury's discretion. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 80, 241 P.3d at 238–39. Appellant also challenges the sufficiency of the evidence to show the murders were especially heinous, atrocious, and cruel. This Court reviews the record to determine whether the evidence, considered in the light most favorable to the State, was sufficient for a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. *Magnan v. State*, 2009 OKCR 16, ¶ 29, 207 P.3d 397, 407.

■ ¶ 68 To support this aggravating circumstance the State must prove beyond a reasonable doubt that the defendant inflicted either torture, including great physical anguish or extreme mental cruelty, or serious physical abuse, and that, for great physical anguish or serious physical abuse, the victim experienced conscious physical suffering before death. *DeRosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156.

■ ¶ 69 Appellant carried out these fatal attacks over approximately forty minutes. Shortly after Faye Miller thought someone in the suspicious vehicle had seen her making the 911 call at 4:49 a.m., Appellant crossed the road carrying his rifle and trapped the Millers inside their garage. The presence of one of Carl Miller's house slippers just outside the garage indicates that the victims sought to escape after Appellant surprised them.

¶ 70 The attack on Carl Miller involved repeated blows from the rifle butt, which lacerated and fractured his skull. He suffered bruises and scrapes consistent with conscious movement during the attack and attempts to defend himself. He struck his head at some point against the rear tire of a car in the garage, but was found lying against the garage door some distance away. Mr. Miller was still partially conscious when officers found him, but could not speak as a result of his injuries. He appeared to be in pain.

¶ 71 Appellant severely beat and sexually assaulted Faye Miller in her own bedroom. She was found with her legs on the floor, lying face down across the bed, unconscious but still breathing. In addition to massive head trauma, Faye Miller had injuries to her hands, arms, and legs, indicating she tried to resist the attack. Shawn Monk heard Appellant demand money from Ms. Miller and sexually humiliate her.

¶ 72 The Millers endured a horrifying early morning invasion of their rural home before police officers could arrive to help them. The sustained manner of these attacks permits the inference that Appellant pursued the victims and viciously pounded them, one by one, into submission, and ultimately, death. Counsel for the Appellant in his brief concedes that "the Millers suffered unspeakably brutal and horrific deaths." In the light most favorable to the State, the evidence is sufficient for any rational jury to find beyond a reasonable doubt that the victims endured

torture and serious physical abuse before their deaths. Proposition Nine is therefore denied.

¶ 73 In Proposition Ten, Appellant argues that the trial court and the prosecutor diminished the burden of proof by defining the concept of reasonable doubt. As Appellant failed to object to either of the challenged comments, we review only for plain error. *Simpson*, 1994 OK CR 40, ¶ 2, 876 P.2d at 692–93. During *voir dire* examination, the trial court told jurors:

> You'll watch a lot of TV shows where they want to talk to you about the state has to prove their case beyond a reasonable doubt. That's not the burden of proof. It's not beyond a shadow of a doubt; it's beyond a reasonable doubt. And that burden of proof goes to the elements only.

The prosecutor in *voir dire* also referenced what Appellant terms a "supposed distinction" between a shadow of a doubt and a reasonable doubt, and referred to the presumption of innocence as "one of those buzz words that you hear on TV shows."

¶ 74 Our preliminary inquiry is whether these challenged comments were a plain or obvious violation of law. *Murphy*, 2012 OK CR 8, ¶ 18, 281 P.3d at 1290. The Court has long disapproved of attempts by the trial court or counsel to *define* reasonable doubt for the jury. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 62, n. 13, 241 P.3d at 234 n. 13 (citing cases). However, distinguishing the applicable burden of proof from popular misconceptions is not an improper attempt to define or diminish the reasonable doubt standard. *Taylor v. State*, 2011 OK CR 8, ¶ 47, 248 P.3d 362, 377 (citing *Myers v. State*, 2006 OK CR 12, ¶ 57, 133 P.3d 312, 329)(comments contrasting "shadow of a doubt" and other phrases with applicable standard did not violate prohibition against defining reasonable doubt). The court and counsel may "attempt to dispel commonly held attitudes concerning the definition of reasonable doubt." *Id.* Appellant has shown no plain or obvious error in the challenged comments. Proposition Ten is denied.

¶ 75 In Proposition Eleven, Appellant claims the deficient performance of his trial attorneys violated his right to the assistance of counsel under the Sixth and Fourteenth Amendments and Article II, section 20 of the Oklahoma Constitution. We address this proposition by applying the familiar test required by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To prevail, Appellant must show that counsel's performance was deficient, and that the deficient performance deprived him of a fair trial with a reliable result. *Fisher v. State*, 2009 OK CR 12, ¶ 7, 206 P.3d 607, 609; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003).

¶ 76 Counsel's performance is measured by an objective standard of reasonableness under prevailing professional norms. *Harris v. State*, 2007 OK CR 28, ¶ 29, 164 P.3d 1103, 1114; *Rompilla v. Beard*, 545 U.S. 374, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005). We consider counsels' choices from their perspective at the time, and give great deference to counsels' decisions. *Rompilla*, 545 U.S. at 380–81, 125 S.Ct. at 2462; *Wiggins*, 539 U.S. at 523, 123 S.Ct. at 2536. We presume counsels' conduct is professional and their actions are the product of a reasonable trial strategy. *Harris*, 2007 OK CR 28, ¶ 29, 164 P.3d at 1115.

[54, 55] ¶ 77 Appellant must also show a reasonable probability that, but for counsel's deficient performance, the outcome of the trial would have been different. *Littlejohn v. State*, 2008 OK CR 12, ¶ 27, 181 P.3d 736, 745. A reasonable probability is one sufficient to undermine confidence in the outcome. *Fisher*, 2009 OK CR 12, ¶ 7, 206 P.3d at 609. If a claim of ineffectiveness can be resolved on the ground of lack of sufficient prejudice, we will follow that course. *Bland v. State*, 2000 OK CR 11, ¶ 113, 4 P.3d 702, 731.

¶ 78 Appellant first contends that counsel rendered unreasonably deficient performance in waiving the voluntary intoxication instructions.[2] The record reflects that

---

2. The uniform jury instructions on voluntary in-

toxication include OUJI–CR(2d) Instructions

counsels' waiver of these instructions was a strategic decision, with which Appellant agreed after consultation. In declining the instruction, which counsel assumed Appellant would be entitled to because of the evidence of his intoxication, trial counsel explained their concern that under the voluntary intoxication instruction:

[I]f it hasn't been proven to them by the defendant that he was incapable of forming, in this case, malice aforethought, then malice aforethought exists.

¶ 79 Counsel acknowledged that the instruction placed no burden on them to prove intoxication, but further stated that:

In a case where we have what we believe is significant evidence of a lack of malice *outside of the intoxication*, we don't want to run the risk that we can confuse the jury and essentially cause them to shift the burden to the defense side (emphasis added).

¶ 80 In *Grissom, supra*, defense counsel opted to concede guilt on the charge of first degree murder and focus the entire defense on the penalty phase. There, the Court held that:

[w]here the defendant makes admissions by counsel during trial that render every defense unavailable save one, he is deemed to have elected that defense; and may, by his election, foreclose the submission of instructions on other theories of defense or lesser-included offenses inconsistent with his defense.

2011 OK CR 3, ¶ 35, 253 P.3d at 982.

 ¶ 81 The decision to waive particular jury instructions is analogous to other "classic example[s] of strategic trial judgment for which Strickland requires that judicial scrutiny be highly deferential." *Malone v. State*, 2013 OK CR 1, ¶ 18, 293 P.3d 198, 207 (waiver of jury in capital sentencing trial). To violate the Sixth Amendment guarantee, counsel's tactical judgment or advice must have been completely unreasonable, not merely wrong, so that it bore "no relationship to a possible defense strategy." *Id.* (quotations and citation omitted). Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

¶ 82 Although appellate counsel argues that defense counsel "meticulously set up a defense of voluntary intoxication," then unreasonably abandoned it by declining the relevant instructions, this argument mischaracterizes counsel's trial strategy. On Appellant's behalf, trial counsel acknowledged to the jury that Appellant had killed the Millers unlawfully and assaulted Shawn Monk with a dangerous weapon. Defense counsel, with Appellant's express consent, sought convictions of second degree murder in the killings. Consistent with this strategy, counsel elicited evidence during the trial, and urged the jury in the first stage closing argument to consider, a range of facts indicating Appellant's lack of premeditation.[3]

---

Nos. 8–35 to 8–39. Instruction No. 8–36, as relevant here, provides that:

A person is entitled to the defense of intoxication if that person was incapable of forming the specific criminal intent of malice aforethought because of his intoxication.

Instruction No. 8–38, as relevant here, would read:

It is the burden of the State to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of malice aforethought. If you find that the State has failed to sustain that burden, by reason of the intoxication of [the Defendant], then [Defendant] must be found not guilty of first degree murder. You may find [Defendant] guilty of [second degree murder], if the State has proved beyond a reasonable doubt each element of the crime of [second degree murder].

Instruction No. 8–39 defines intoxication as a "state in which a person is under the influence of an intoxicating liquor/drug/substance to such an extent that his/her (passions are visibly excited)/(judgment is impaired)."

3. Counsel elicited testimony and argued at trial that Appellant was drunk; he had drawn attention to himself by shooting his rifle from the road; his car was broken down and parked in the wrong lane; he had not loaded his rifle or shot the victims, though he could have; he had left the victims alive, and allowed Shawn Monk to call for help. Appellate counsel reiterated most of these themes in his challenge to the sufficiency of the evidence to prove malice aforethought.

¶ 83 Despite its marginal chances of success, defense counsel advanced a thoughtful argument for convicting Appellant of lesser included offenses, presenting jurors with reasons to doubt the element of malice aforethought that were not entirely dependent on the relatively weak intoxication evidence. Counsels' tactical recommendation that Appellant decline the intoxication instructions was reasonable and bore a visible relationship to the overall defense strategy. This argument fails.

¶ 84 Appellant also argues that counsel were ineffective for failing to raise the due process challenge in Proposition One, failing to object to the chemical blood test results and related testimony, and failing to request a negative inference instruction regarding the lost evidence. Our resolution of the related propositions also forecloses these claims of ineffectiveness. In Proposition One, we found no due process violation in the State's failure to collect and preserve an earlier blood sample for testing. Reviewing the admission of the blood test result and related testimony in Proposition Three, the Court found no plain or obvious error. Any objection to this evidence at trial would have been properly overruled, and a negative inference instruction would have been properly denied. *Cuesta–Rodriguez v. State,* 2010 OK CR 23, ¶ 61, 241 P.3d at 234 (absent bad faith by police, negative inference instruction on destruction of evidence is improper). These omissions by counsel cannot satisfy either the deficient performance or prejudice standards of Strickland. *Mitchell v. State,* 2011 OK CR 26, ¶ 144, 270 P.3d 160, 191. We reach the same conclusion regarding trial counsel's failure to preserve the alleged errors raised in other propositions. As Appellant has shown neither unreasonably deficient performance, nor that such performance creates a reasonable probability of a different outcome at trial, Proposition Eleven is denied.

■ ¶ 85 Proposition Twelve argues the accumulation of errors in this case warrants reversal or modification of the sentence. When numerous irregularities during the trial tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Warner v. State,* 2006 OK CR 40, ¶ 223, 144 P.3d 838, 896. However, such an argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Id.*

¶ 86 The Court found minor errors in the prosecutor's use of exhibits during opening statement, the admission of hearsay evidence from reports, and testimony concerning the racial remarks by the Appellant. Some of these errors were cured by the trial court's instructions or by the admission of proper evidence, and none of the individual errors unfairly prejudiced the Appellant or contributed to an arbitrary or unreliable result in either stage of the trial. Considering the potential cumulative effect of these errors on the fairness of the proceedings and the reliability of the results, we find Proposition Twelve requires no relief.

¶ 87 This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the aggravating circumstances. 21 O.S.2001, § 701.13(C). The jury's findings of the aggravating circumstances are factually supported. 21 O.S.2001, §§ 701.12(2), (4). Appellant presented substantial evidence of mitigating circumstances for the jury to weigh against the evidence of aggravation. The Court finds that the jury was not improperly influenced by passion, prejudice, or any other arbitrary factor in its determinations of guilt or sentence. The sentences of death are factually substantiated and appropriate.

## DECISION

¶ 88 The Judgment and Sentence of the District Court of Comanche County is **AFFIRMED.** Pursuant to Rule 3.15, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2016), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

SMITH, P.J., JOHNSON and HUDSON, JJ.: concur.

LUMPKIN, V.P.J. concur in result.