DAVISON v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:DAVISON v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 DAVISON v. STATE
2020 OK CR 22
Case Number: D-2018-373
Decided: 11/19/2020
DUSTIN MELVIN DAVISON, Appellant v. STATE OF OKLAHOMA, Appellee.

Cite as: 2020 OK CR 22, __ __

 

OPINION
LEWIS, PRESIDING JUDGE:
¶1 Dustin Melvin Davison, Appellant, was tried by jury and found guilty of first degree murder, in violation of 21 O.S.Supp.2012, § 701.7(C), in the District Court of Oklahoma County, Case No. CF-2015-3992. The jury found as aggravating circumstances that the murder was especially heinous, atrocious, or cruel, and that there exists a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society, and sentenced him to death. The Honorable Cindy H. Truong, District Judge, pronounced judgment and sentence accordingly. Mr. Davison appeals.
FACTS
¶2 On the afternoon of May 18, 2015, K.B., the two-year-old son of Jennifer Young, died at Children's Hospital in Oklahoma City. Earlier that day, K.B. had suffered multiple blunt force traumas to his head and torso, resulting in fifty or more areas of external bruising; a broken mandible; a fracture of the skull behind his right ear; internal damage and hemorrhaging from the liver, pancreas, and intestinal mesentery; hemorrhages of the scalp, subgaleal, subdural and subarachnoid areas of the head; retinal hemorrhage; and edema throughout the brain. K.B.'s fatal injuries involved the application of substantial force inconsistent with typical play or accidents. The State's medical experts later testified that K.B.'s injuries indicated he had been beaten to death.
¶3 On the day K.B. died, he and his mother, Jennifer Young, were living with the Appellant, Dustin Davison, in an apartment paid for by Ms. Young. Appellant was Ms. Young's ex-boyfriend, but they remained roommates, and Appellant watched K.B. while Ms. Young worked. Around 11:00 a.m. that morning, Appellant and K.B. dropped off Ms. Young at work. Appellant and K.B. then returned to the apartment and apparently remained there until Appellant called 911 seeking emergency assistance for K.B.
¶4 During the investigation of K.B.'s death, Appellant gave investigators several conflicting accounts of the events leading up to his 911 call. Appellant first claimed he came out of the shower to find K.B. lying on the floor, bleeding from his nose and mouth. He later claimed that K.B. fell and hit his head on a coffee table during a pillow fight, or that the family dog had knocked him into the table. He also stated that K.B. had bumped his forehead in the bathtub the previous day.
¶5 Appellant told police at one point that K.B.'s extreme bruising was caused by Jennifer Young's brother. He also stated at various times that K.B. had fallen from the apartment balcony, been struck by a soccer ball, had a chair pulled out from under him, or fallen to the ground at 7-11. Appellant admitted being a "straight up asshole" to K.B. when K.B. "pissed him the fuck off." Appellant also admitted throwing K.B. to the ground, probably causing K.B.'s skull fracture, and waiting twenty minutes or more to call 911.
¶6 Contrary to these statements, Appellant took the stand at trial against the advice of counsel and testified that a man named Jeremy Walker had killed K.B. after coming to the apartment to buy drugs that day. Appellant claimed that he had injected methamphetamine while Walker was there and temporarily lost consciousness. When he woke up, Walker had left the apartment and K.B. was lying on the floor seriously injured. Appellant told the jury that Jeremy Walker had "aggressively killed and murdered" the victim. Appellant had "tried to save" K.B., and had "wasted time trying to revive him" instead of calling 911.
¶7 Appellant said that he "didn't know how to explain" the injuries inflicted by Jeremy Walker to investigators, which "made me out to be--to look like a liar." Appellant said he "would never hurt" K.B. because he "loved that child." Appellant claimed he "had to make up more stories" only because he wanted to tell Jennifer Young "what truly happened" before he told investigators. He "wanted to tell [the investigating detective] the truth, but I didn't know how to."
¶8 On cross-examination, the State established that Appellant was not selling drugs to Jeremy Walker every weekend, as he had claimed in his testimony. According to phone records, Appellant hadn't spoken to Walker in more than two and a half months before the homicide. Appellant acknowledged that he had waited a year and a half after being charged with this murder to name Jeremy Walker as the real perpetrator.
¶9 Appellant admitted on cross-examination that he had repeatedly lied to investigators, his parents, and his siblings about the facts of K.B.'s death as he tried to deflect suspicion from himself, but had waited almost eighteen months to name the real killer. Appellant also admitted that when naming Jeremy Walker as the murderer didn't work, Appellant offered to implicate a fellow jail inmate in the murder in exchange for a deal. Appellant also agreed when the prosecutor asked him if he thought he was the real victim in this case.
¶10 Additional facts will be related in connection with the individual propositions of error.
ANALYSIS
¶11 In Proposition One, Appellant argues that he was denied the effective assistance of trial counsel in violation of the Sixth, Eighth, and Fourteenth Amendments and Article II, sections 7, 9, and 20 of the Oklahoma Constitution. We address these complaints applying the test required by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984), by initially presuming that counsel rendered reasonable professional assistance. Appellant must establish the contrary by showing that trial counsel's performance was unreasonably deficient and that he was prejudiced by the deficient performance. Spears v. State, 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445.
¶12 To determine whether counsel's performance was deficient, we ask whether the representation was objectively reasonable under prevailing professional norms. In this inquiry, Appellant must show that the trial attorney made errors so serious that the attorney was not functioning as the counsel guaranteed by the Constitution. Browning v. State, 2006 OK CR 8, ¶ 14, 134 P.3d at 816, 830. The overriding concern in judging trial counsel's performance is "whether counsel fulfilled the function of making the adversarial testing process work." Hooks v. State, 2001 OK CR 1, ¶ 54, 19 P.3d 294, 317.
¶13 Where the Appellant shows counsel's performance was objectively deficient under prevailing professional norms, he must further show that he suffered prejudice as a result. The Supreme Court in Strickland defined prejudice as a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial or sentencing would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694. If the record permits resolution of an ineffective counsel claim on the ground that Strickland's prejudice prong has not been satisfied, we will ordinarily follow this course. Phillips v. State, 1999 OK CR 38, ¶ 103, 989 P.2d 1017, 1043.
¶14 Appellant challenges several aspects of trial counsel's representation as deficient. He first alleges that trial counsel's failure to develop and utilize expert neuropsychological evidence deprived him of a fair trial on the issues of guilt and sentence. In connection with this claim, he has filed a Notice Of Extra-record Evidence Supporting Propositions I And II Of The Brief Of Appellant And, Alternatively, Rule 3.11 Motion To Supplement Direct Appeal Record Or For An Evidentiary Hearing (hereafter the Rule 3.11 Motion), as permitted by Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App (2020).
¶15 We review a Rule 3.11 motion and the attached extra-record materials in light of the existing record, in conjunction with the appellant's corresponding claim(s) of ineffective assistance. Rule 3.11(B)(3)(b)(i) requires the appellant to present "sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."
¶16 If the Court finds that a strong possibility of ineffectiveness is shown, we will remand the matter for an adversarial evidentiary hearing and direct the trial court to make findings of fact and conclusions of law on the issues and evidence raised in the application. Rule 3.11(B)(3)(b)(ii). The resulting evidence and judicial findings and conclusions on remand may then be considered in adjudicating Appellant's corresponding claim(s) of ineffective counsel. Rule 3.11(B)(3) and (C).
¶17 This standard is less demanding than the two-prong test for ineffective assistance imposed by Strickland: It is easier to show clear and convincing evidence of a strong possibility that counsel was ineffective than to show that counsel's performance was deficient, and that a reasonable probability exists that the result of the proceeding would have been different. When the Court grants a request for an evidentiary hearing under Rule 3.11(B), we have decided only that the appellant has shown a strong possibility that counsel was ineffective, and should be afforded a further opportunity to develop this claim. On the other hand, when we deny a request for an evidentiary hearing on a claim of ineffective assistance under the Rule 3.11(B) standard, we necessarily conclude that the appellant has not sustained the corresponding claim of ineffective assistance under the more rigorous Strickland standard. Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 906.
¶18 Appellant attaches to his Rule 3.11 motion affidavits from his trial and appellate counsel and a neuropsychologist, and various documents showing appellate counsel's efforts to obtain an MRI of Appellant's brain during the pendency of this appeal. Trial counsel's affidavit states that she obtained Appellant's birth, school, and other medical records. None of these records or reported family history showed Appellant had suffered head trauma. Appellant's birth records and other testimony at sentencing did indicate a period of post-natal cyanosis and pneumonia, but he was discharged from the hospital five days after birth.
¶19 Trial counsel's affidavit states that she retained forensic psychologist Terese Hall, J.D., Ph.D., to review Appellant's school and medical records and evaluate Appellant for a possible insanity defense. Dr. Hall conducted some psychological testing on Appellant and consulted with defense counsel regarding her diagnostic impressions, which weighed against a finding of insanity defense or other significant mental illness. Trial counsel also researched and consulted with several other mental health experts "in search of helpful mitigation witnesses," including "four forensic psychologists, a criminal sociologist, a neuropsychologist, and a licensed clinical therapist with expertise in sexual trauma."
¶20 Trial counsel ultimately decided not to present any mental health or other expert testimony in the first or second stage of trial. The defense called several family members and personal friends of the Appellant in the sentencing stage, who testified to Appellant's birth complications and cyanosis, his developmental delays, a learning disability and resulting placement in remedial or special education classes, a history of sexual abuse by a family member, separation from his mother after his parents' divorce, witnessing abuse and suffering neglect by his father, substance abuse and addiction, grief from the loss of his younger brother and stepmother to cancer, his acts of kindness toward others, and saving a friend from a drug overdose.
¶21 Shortly before trial, Appellant contradicted his earlier statements to counsel and said he had suffered head trauma at some time before the crime. On appeal, the defense retained neuropsychologist Jeanine Galusha, Ph.D., to review records and evaluate the Appellant. Dr. Galusha's report is attached to the Rule 3.11 motion. In her report, Dr. Galusha indicates that she reviewed treatment records obtained from Deaconess Hospital concerning an automobile collision in January, 2015, after which the Appellant briefly lost consciousness. The report indicates that Appellant's treatment records from that incident showed no cognitive or functional deficits, and a CT scan of his head was deemed unremarkable.
¶22 Dr. Galusha's report also indicates her review of previous records of treatment and evaluation of the Appellant by psychiatrist Janita Ardis, who diagnosed the Appellant in 2013 with depression, poly-substance abuse, and anti-social personality disorder. Dr. Galusha also noted the clinical interview and testing of Appellant by Dr. Terese Hall, after which Hall concluded that Appellant was not legally insane, had no "genuine mental health problems," and may have been malingering his symptoms.
¶23 Dr. Galusha's report references previous evidence of Appellant's educational problems, including a learning disability in expressive and receptive speech for which he received speech therapy and remedial education through the 9th grade. Appellant was given a battery of educational testing in 2001 (age 8) and 2005 (age 11). On two standardized tests of intelligence, Appellant's full scale intelligence quotient (IQ) was measured at 90 (low average) in 2001 and 85 (low average) in 2005. Appellant's performance on various tests of academic achievement given during this time was consistently below average.
¶24 In March, 2019, Dr. Galusha administered another battery of neuropsychological and educational tests to Appellant at the request of appellate counsel. In her report, Dr. Galusha states that Appellant scored in the normal range on various tests of effort and appeared not to be feigning intellectual disability or mental disorder. Despite this impression, Dr. Galusha obtained a "significantly reduced" Full Scale IQ of 74 on the Wechsler Adult Intelligence Scale-IV, which she found "consistent with [Appellant's] overall clinical presentation but lower than expected compared to prior testing."
¶25 Appellant's performance on several other tests of academic and cognitive function was mixed, with borderline reading ability, low average reading comprehension, mildly impaired to low average non-verbal problem solving and abstract reasoning, borderline verbal comprehension, a mildly impaired general fund of information, low average working memory, average on a sixteen-item verbal list-learning task, and mildly impaired immediate recall of a complex geometric figure.
¶26 Appellant's scores on the Personality Assessment Inventory indicated his endorsement of some "items that presented his psychological functioning more negatively than the clinical picture would warrant." His responses indicated a person with a history of substance abuse "who tends to be suspicious and angry," "lacks good coping mechanisms," and exhibits a "personality style with many anti-social character features."
¶27 Based on her testing and evaluation of the Appellant, Dr. Galusha concludes:
Overall, the current findings suggest a decline in verbal functioning and aspects of executive functioning, the exact etiology of which is unknown but may be impacted by reported birth complications, head injuries, and chronic substance abuse, all of which can be associated with mood dysregulation, and/or impairment/decline in cognitive functioning. Neurological work-up, to include an MRI of the brain is recommended and would be useful to further elucidate the nature and cause of the observed impairments. 
¶28 Dr. Galusha further opines that if "birth records regarding cyanosis, school records indicating special education, history of head injuries, and significant substance abuse" had been available at the time of trial, "a neuropsychological evaluation would have been warranted at that time." Appellant's remaining submissions document counsel's unsuccessful efforts to obtain the brain MRI recommended by Dr. Galusha and his request to "grant him enough time to obtain the [brain MRI] prior to" any remanded evidentiary hearing on his Rule 3.11 Motion and corresponding ineffective assistance claims.
¶29 Considering Appellant's claim in light of the trial record, the arguments in his brief, and the materials submitted in his Rule 3.11 Motion, the Court finds that Appellant has not shown clear and convincing evidence that suggests a strong possibility that trial counsel was ineffective in failing to develop and utilize the evidence presented here. Trial counsel conducted an extensive mitigation investigation including psychological experts, and ultimately made strategic decisions not to use expert testimony. However, the mitigating evidence presented in the second stage of trial was extensive, and included relevant evidence of birth complications, developmental delays, learning disability, academic failure, victimization by sexual abuse, family instability, abuse, and neglect, adolescent onset substance abuse and addiction, grief from the loss of two close family members, Appellant's acts of kindness and ability to form meaningful relationships, and his saving a friend from a drug overdose.
¶30 Appellant argues that this omitted evidence of his low intellectual functioning "would have explained and countered" his many inaccurate and incriminating statements to police and his decision to testify. Appellate counsel also takes issue with the lack of expert defense testimony in the sentencing stage, arguing that Appellant's assault on the victim was so "out of character" that counsel had to know "something was wrong." Appellant argues that expert testimony was necessary to "explain how his life events could lead up to those actions." Appellant also maintains that the omission of expert testimony in the sentencing stage allowed the State to argue the lack of expert testimony regarding much of the evidence mentioned in the mitigation instruction given to the jury.
¶31 We are not persuaded that trial counsel's omission to utilize or develop testimony of the type presented in Appellant's Rule 3.11(B) motion is clear and convincing evidence of a strong possibility that trial counsel was ineffective. At most, Appellant's submissions indicate some new corroboration for his claimed history of head trauma in 2015, and some evidence that he recently scored somewhat lower on testing of his academic and general intellectual functioning than in years past.
¶32 The Rule 3.11(B) submissions indicate that the head trauma Appellant suffered in 2015 was minimal. And viewed in light of the entire record, Appellant's lower scores on IQ and other testing in 2019 are open to serious doubt, and do not establish the kind of cognitive impairment that would either significantly diminish the reliability of the guilty verdict in the first stage of trial, or meaningfully shift the balance of aggravating and mitigating circumstances presented to the jury in the sentencing stage of trial. Grissom v. State, 2011 OK CR 3, ¶ 82, 253 P.3d 969, 995-96.
¶33 The record before us strongly indicates that trial counsel exercised reasonable professional judgment in the investigation and presentation of the mitigating evidence, even though the lens of hindsight can show how things might have been done differently. Appellant has not shown that counsel was ineffective for failing to utilize the type of evidence presented in his supplemental materials, and no evidentiary hearing is necessary. This much of the Appellant's claim, and his request for evidentiary hearing, are without merit.
¶34 Appellant also argues that trial counsel was ineffective for failing to challenge two jurors for cause. He points to the statements during voir dire of three prospective jurors who expressed a clear preference for the punishments of life imprisonment or death, and indicated at various times that they could not give the same consideration to the punishment option of life without parole, which they saw as pointless or a kind of compromise decision on punishment. Defense counsel successfully challenged two of these jurors for cause, and removed the third one with the seventh peremptory. Appellant also takes issue with counsel's failure to challenge yet another juror for cause, after she expressed the view that the death penalty would be her preference for child killers and serial killers.
¶35 Appellate counsel maintains that trial counsel has a constitutional "duty" to challenge any prospective juror whose voir dire suggests plausible reasons to remove the juror for cause. On the contrary, Strickland analysis requires that a reviewing court indulge a substantial measure of deference to counsel's strategic decisions. We have recognized that such deference makes the burden to prove professional deficiency in jury selection very "heavy indeed." Young v. State, 1998 OK CR 62, ¶ 72, 992 P.2d 332, 347.
¶36 We conclude that trial counsel's failure to challenge these prospective jurors for cause is not the kind of serious professional error that amounts to deficient performance under Strickland. And even if we assumed that counsel's omission was objectively deficient, Appellant fails to show how these errors create a reasonable probability of a different outcome at trial. Any claim that Appellant was denied an impartial jury "must focus on the jurors who ultimately sat" in judgment. Rojem, 2006 OK CR 7, ¶ 36, 130 P.3d at 295. Trial counsel removed these allegedly tainted jurors with peremptory challenges, and none of them served on the jury that convicted and sentenced him. This allegation of ineffective assistance requires no relief.
¶37 Appellant next argues that trial counsel was ineffective by failing to object to the admission of photographic evidence challenged in Propositions Four, Five, and Seven. Because we conclude in our analysis of those propositions that no reversible error occurred in the admission of these photographs, Appellant cannot demonstrate a reasonable probability that the outcome of his trial or this appeal would have been different if trial counsel had objected to this evidence. He has shown neither deficient performance nor prejudice under Strickland. Phillips, 1999 OK CR 38, ¶ 104, 989 P.2d at 1044.
¶38 Appellant's final challenge to trial counsel's representation is that counsel failed to seek redaction of what he perceives as unfairly prejudicial statements by both himself and investigators in his recorded interviews with police. Appellant cites no specific authority that the challenged portions of his statements were subject to redaction. The trial court determined that Appellant's recorded statements to police were voluntary and admissible. The interviews were directly relevant to the issues on trial. And again, even if we assume that timely objections would have led to redaction of the few statements challenged here, we find no reasonable probability that the outcome of the proceeding would have been different. This is a sufficient ground for denying Appellant's claim. Id.
¶39 We find that Appellant has failed to show that trial counsel committed any errors so serious that they were not functioning as the counsel guaranteed by the Sixth, Eighth, and Fourteenth Amendments. Considering both the individual and cumulative impact of counsel's allegedly deficient performance, we find that even if counsel were unreasonably deficient in some particular aspect of representation, their allegedly deficient performance creates no reasonable probability of a different outcome in either stage of the trial. Proposition One is denied.
¶40 In Proposition Two, Appellant argues that trial counsel conceded guilt in closing argument without his express consent and contrary to his trial testimony, in violation of the Sixth and Fourteenth Amendments. He relies principally on McCoy v. Louisiana, 138 S.Ct. 1500 (2018), in which the Supreme Court held that the Sixth Amendment guarantees a defendant's right to insist that counsel refrain from admitting guilt, even when counsel reasonably believes such a concession in the first stage of trial is the best strategy for avoiding the death penalty. Id., 138 S.Ct. at 1505.
¶41 As already mentioned, Appellant chose to testify at trial that a third party named Jeremy Walker had murdered K.B. while Appellant was unconscious. Because trial counsel believed Appellant's planned testimony was false, they refused to participate in the direct examination for ethical reasons.
[1] The trial court permitted Appellant to testify directly to the jury in narrative form, after which he was cross-examined by the prosecutor. The defense called no other first stage witnesses, and rested its case. Appellant now argues that defense counsel's first stage closing argument conceded guilt in violation of his right to control the ultimate objectives of his defense as recognized in McCoy.
¶42 In a brief first-stage closing argument that spans five pages of transcript, trial counsel made no reference to Appellant's testimony maintaining innocence. Counsel briefly expressed sympathy for K.B.'s mother, and conceded Appellant "did spend a lot of time with [the child], by just the force of circumstances." Trial counsel also mentioned Appellant's weight loss and poor hygiene, saying "[t]hat's drug usage," and that Appellant was "going downhill" at the time.
¶43 Counsel characterized the argument Appellant had with Jennifer Young about cleaning the apartment and taking out the dog as "low-level," not enough to "get somebody [too upset]." Counsel then turned to the child's injuries, saying they "happened rapidly," and "then the 911 calls." Finally, counsel submitted to the jury that "the person who did this is probably trying to block things out . . . he can't imagine that he did this, but he did it. Okay. But he just could be blocking it out."
¶44 The trial court then sustained the prosecutor's objection to counsel arguing "facts not in evidence." Trial counsel then urged jurors to "look very closely at the requirements for malicious injury . . . [and] just ask yourself whether or not the killing . . . was malicious, and it's got to be beyond a reasonable doubt. I didn't make that up. That's the law. It's got to be beyond a reasonable doubt for each element of the crime. Thank you for your attention. This has been a relatively short trial, and thank you."
¶45 Black's Law Dictionary 262 (5th Ed. 1979) defines a concession as "a yielding to a claim or demand." Webster's Ninth New Collegiate Dictionary 271 (1986) says to "concede" is to "accept as true, valid, or accurate." The unabridged Webster's Third New International Dictionary 469 (1963) says to "concede" is to "acknowledge grudgingly or hesitantly;" or to "acknowledge as won by an opponent without formal determination of the result."
¶46 Viewing the first-stage closing argument in context, we find that trial counsel did not concede Appellant's guilt of first degree murder in violation of the Sixth Amendment. While counsel did not (and could not, ethically) maintain Appellant's innocence based on Appellant's testimony that Jeremy Walker was the real murderer, nor did trial counsel at any point concede that the State had proven Appellant's guilt of first degree murder. Knapper v. State, 2020 OK CR 16, ¶ 70, ___ P.3d ___, ___ (holding closing argument contained no concession, where defense counsel never said that Appellant was the killer, that defendant committed the charged offenses, or that defendant's guilt was uncontested).
¶47 Despite long, perhaps impossible, odds, counsel's first-stage argument pursued an acquittal based on reasonable doubt of the elements of child abuse murder, specifically the element of willful or malicious injury being the cause of death. Counsel therefore did not concede Appellant's guilt according to the plain meaning of the term, and did not unconstitutionally usurp control of the objectives of Appellant's defense in violation of the Sixth Amendment. Proposition Two is denied.
¶48 In Proposition Three, Appellant argues the trial court violated his Eighth and Fourteenth Amendment rights by denying his challenges for cause to two prospective jurors whose views on capital punishment would have prevented or substantially impaired their ability to serve as fair and impartial jurors. Ross v. Oklahoma, 487 U.S. 81, 85 (prospective juror who declared that in the event of conviction, he would vote to impose death automatically, should have been removed for cause).
¶49 The trial court denied Appellant's challenges for cause to prospective jurors C.A. and D.H. C.A. gave several responses suggesting a strong preference for the death penalty, but also gave responses agreeing to consider the three available punishments for first degree murder. D.H. expressed a preference for the death penalty where the victim was defenseless, that she couldn't see the point of sentencing the defendant to life with the possibility of parole, and that option was not acceptable. However, D.H. eventually responded, to the apparent satisfaction of the trial court, that she could consider all three punishments.
¶50 This Court reviews the trial court's rulings on challenges for cause for abuse of discretion, which has been defined as a clearly erroneous conclusion, contrary to the logic and effect of the facts presented. Nicholson v. State, 2018 OK CR 10, ¶ 7, 421 P.3d 890, 894-95. Every capital trial juror must be willing to fairly and impartially consider the possible punishments of life, life without parole, and death. Glossip v. State, 2007 OK CR 12¶ 31, 157 P.3d 143, 150. When a prospective juror's views on capital punishment would prevent or substantially impair the performance of their duties in considering punishment, the trial court should, upon request, remove the juror for cause. Wainwright v. Witt, 469 U.S. 412, 424 (1985).
¶51 When reviewing the denial of a challenge for cause, we consider the entire record of the prospective juror's responses on voir dire. Rojem v. State, 2009 OK CR 15, ¶ 3, 207 P.3d 385, 388. We also consider whether the prospective juror's stated views were informed by sufficient instructions on the law as well as the oath and responsibilities of a juror. Eizember v. State, 2007 OK CR 29, ¶¶ 41-42, 164 P.3d 208, 221-22. The law does not require that a prospective juror's bias appear with unmistakable clarity, and the court should resolve doubts regarding a prospective juror's ability to serve impartially in the defendant's favor. Id.
¶52 Prospective jurors are often unsure about the law of capital punishment and have a limited comprehension of what counsel and the trial court are asking them during capital-qualification of the jury. Equivocal or seemingly contradictory expressions of strong support for, or opposition to, a particular punishment, as well as a good faith willingness to consider all three punishments when actually instructed by the court to do so, are common in capital trials. See Eizember, 2007 OK CR 29, ¶ 43, 164 P.3d at 222 (noting that prospective juror's written responses on jury questionnaire that if convicted, defendant would be "on death row" reflected a misunderstanding of the law of capital punishment, and were not disqualifying in light of other statements in voir dire).
¶53 Such mixed responses typically leave the question of a particular juror's qualification within the trial court's sound discretion. We recognize that C.A. and D.H. at times expressed apparent biases in favor of capital punishment or against other non-capital options, as well as a willingness to follow the instructions of the court. Though these jurors present closer questions than some, the trial court's rulings are not contrary to the logic and effect of the facts presented about their views of capital punishment or their ability to follow the law.
¶54 Even if we assume that the trial court's refusal to remove these prospective jurors was erroneous, the relevant question is really whether, as a result of the trial court's rulings, Appellant was forced, over objection, to keep an "unacceptable" juror. Eizember, 2007 OK CR 29, ¶ 36, 164 P.3d at 220. The Court has not clearly defined when a trial juror will be judged "unacceptable" in this sense. However, our case law indicates that the term means something less than the express or implied bias that warrants removal for cause. On the other hand, reversal of a capital conviction is not warranted simply because a defendant was ultimately tried and sentenced by one or more jurors whom the defendant would have preferred to remove.
¶55 Jurors whose attitudes are strongly identified with the adverse party, or who are otherwise unfavorably disposed toward the trial, but who are not disqualified for actual bias, can still be "undesirable." Rojem, 2006 OK CR 7, ¶ 38 and n.11, 130 P.3d at 296 and n.11 (finding juror who did data entry for local police, whose brother was officer, who had read news reports, knew a prosecution witness, discussed the case with her mother, and was worried about financial impact of the case, was "undesirable" to defendant's position, and established prejudice requiring reversal). But a mere preference for or against a particular juror seated over objection, standing alone, does not render that juror "undesirable" to a party's position. Grant v. State, 2009 OK CR 11, ¶ 22, 205 P.3d 1, 12 (finding no prejudice where allegedly "unacceptable" juror was not challengeable for cause; had encountered some police officers during recent restaurant employment who had no connection to this case; and had assured the court that these brief contacts had no impact on her ability to serve).
¶56 Borrowing in part from a definition first proposed by Judge Lumpkin in Jones v. State, 2006 OK CR 17, ¶ 13, 134 P.3d 150, 159 (Lumpkin, J., concurring in part and dissenting in part), we now hold that an "unacceptable juror"--which the Court has at times referred to as a juror who is "undesirable" to the defendant's position--means a trial juror: (1) who served over the defendant's objection after the trial court denied the defendant an additional peremptory to remove the juror as unacceptable; (2) who voiced views or opinions in voir dire that raise a reasonable doubt about the juror's bias against the defendant and/or the defendant's position; and (3) whom any reasonable attorney in the position of defense counsel would have removed with a peremptory.
¶57 Applying this standard, we turn to whether the defendant was forced to keep an unacceptable juror. Defense counsel requested additional peremptory challenges to remove prospective jurors L.B. and A.F. Counsel argued that the juror L.B. had grandchildren the same age as the victim, and expressed concern that the trial would break her heart. L.B. had grown emotional in response to voir dire about her ability to view the photographic evidence, saying at one point that it breaks her heart to think of the child victim. Defense counsel requested an additional peremptory to remove the prospective juror A.F. as unacceptable because she worked in the medical field and also had a son.
¶58 We find that neither of these trial jurors were unacceptable jurors under the applicable legal standard. Juror L.B's sentiments or emotional expressions did not raise a reasonable doubt that she would be undesirable to either the defendant or his position in the guilt or sentencing phases of trial. Her feelings about the difficulty of serving as a juror in this kind of case are surely common to most, if not all, capital trial jurors, and raise no real doubt on her ability to be fair and impartial. Likewise, Juror A.F.'s employment as a medical worker and being a parent of a young boy are insufficient to meet the definition of an unacceptable juror. Reasonable attorneys in the position of defense counsel might well have accepted these jurors and others like them, despite trial counsels' misgivings.
¶59 None of the twelve jurors who sat in judgment were challenged by the Appellant for cause, and he has not established here that any of the jurors were other than impartial and reasonably acceptable. The trial court's denial of his challenges for cause to jurors C.A. and D.H., even if in error, did not deny his Eighth and Fourteenth Amendment rights. Jones v. State, 2009 OK CR 1, ¶ 34, 201 P.3d 869, 880. Proposition Three is denied.
¶60 In Proposition Four, Appellant argues that the admission of four photographs of the victim during life deprived him of a fair trial. Appellant failed to object to these photographs at trial. We therefore review this claim only for plain error. Simpson v. State, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 692-93. He must therefore show that plain or obvious legal error in the admission of these photographs affected the outcome of the proceeding. Hogan v. State, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. This Court will remedy a plain or obvious error only if it seriously affects the fairness, integrity, or public reputation of the proceedings, or results a miscarriage of justice. Id.
¶61 The Oklahoma Evidence Code specifically authorizes the admission of an "appropriate" photograph of the victim in a homicide prosecution "to show the general appearance and condition of the victim while alive." 12 O.S.2011, § 2403. The State offered State's Exhibit 1, an undated picture of K.B. inside his apartment, to show his general appearance around the time of the crime. State's Exhibits 2 and 3 showed K.B.'s appearance on a specific date, May 17, 2015, the day before he died. The fourth challenged photograph, identified as State's Exhibit 4, shows K.B. on the evening of May 17, 2015.
¶62 Generally speaking, relevant evidence is admissible at trial. 12 O.S.2011, § 2402. Relevant evidence is evidence "having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S.2011, § 2401. The trial court may exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." 12 O.S.2011, § 2403.
¶63 Appellant fails to show that the admission of these four photographs was plain or obvious error that affected the outcome of the proceeding. State's Exhibit 1 was an appropriate photograph showing the general appearance and condition of the victim. Admission of this photograph as authorized by section 2403 was not plainly or obviously erroneous, and thus provides no basis for reversal. The remaining photos meet the general test of relevancy under section 2401, by tending to establish the timing of K.B.'s injuries as May 18, 2015, and to refute Appellant's claims to police that some of the bruises were inflicted earlier.
¶64 Appellant's argument that the State was limited to a single photograph for this purpose is unpersuasive. The probative value of these three photographs, establishing K.B.'s appearance just a day before his fatal injuries while in Appellant's care, was not substantially outweighed by the danger of unfair prejudice or the other countervailing factors identified by section 2403. Because these photographs meet the basic test of relevance and are not plainly or obviously inadmissible under controlling law, Proposition Four is denied.
¶65 Appellant also challenges the admission of several allegedly gruesome photographs in Proposition Five. The admission or exclusion of evidence over a timely objection or offer of proof is ordinarily discretionary and will not be reversed unless clearly erroneous or manifestly unreasonable. Hancock v. State, 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813, overruled on other grounds, Williamson v. State, 2018 OK CR 15, 422 P.3d 252. Appellant preserved objections to the admission of some photographs, but not others. Our review of the trial court's rulings on these latter photographs is limited to plain error: Appellant must show that their admission plainly or obviously violated controlling law and affected the outcome at trial.
¶66 As for controlling law, the proper inquiry is not whether a relevant photograph admitted in a homicide trial is unpleasant, gruesome, or potentially inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or needless presentation of cumulative evidence. 12 O.S.2011, § 2403; Martinez v. State, 2016 OK CR 3, ¶ 46, 371 P.3d at 1112-13. Photographs can be probative in numerous ways, by tending to prove "the nature, extent and location of wounds, establishing the corpus delicti, depicting the crime scene, and corroborating the medical examiner's testimony[,]" among other things. Bench v. State, 2018 OK CR 31, ¶ 61, 431 P.3d 929, 952.
¶67 The rules of evidence do not require the State to soft-pedal the violent or disturbing aspects of a crime in presenting evidence of the facts. Gruesome crimes result in gruesome photographs. Id., 2018 OK CR 31, ¶ 61, 66, 431 P.3d at 952-953. The Evidence Code effectively creates a presumption that relevant photographs should be admitted as long as they are not "so unnecessarily hideous or repulsive that jurors cannot view them impartially." Bosse v. State, 2017 OK CR 10, ¶ 48, 400 P.3d 834, 853.
¶68 Appellant objected to twelve of the thirty-two photographs admitted at trial. He did not object to State's Exhibits 13-27, a series of photographs of the victim taken at the hospital, or to State's Exhibits 101, 103-110, 122-128, and 131. Trial counsel objected to State's Exhibits 111 and 132-143, a series of post-mortem and autopsy photographs taken at the medical examiner's office, as more prejudicial than probative, and needlessly cumulative to other evidence. The trial court overruled his objections and admitted all of the photographs.
¶69 Appellant's argument proceeds with the complaint that some of photographs were published during the testimony of more than one witness, and challenges the admission of individual photographs in comparison with other photographs showing the same or similar injuries. He essentially theorizes that some of the pictures could have been excluded in favor of others that were slightly less prejudicial or would have diminished the overall prejudicial impact of the photographs.
¶70 We reject this piecemeal approach to the photographs. All of the photographs depicting this child either dying, or already dead, are disturbing. All of them meet the basic test of relevance. Some depict the child's condition and appearance when he was encountered by various emergency and medical personnel who testified at trial. Some document the medical interventions used to treat the child, an unpleasant but necessary aspect of proving the probable timing and source of marks and bruises on the victim's body. Some document the almost fifty individual areas of bruising to the child's body. Some document the observations of internal injuries during the autopsy. Again, all of these are pieces of evidence that individually tend to prove the nature of the crime.
¶71 Considering the probable cumulative probative value and prejudicial effect of the photographs, the trial court did not abuse its discretion in applying the rules of relevance and overruling defense objections to particular photographs. The trial court committed no plain or obvious error in the admission of any particular photograph or group of photographs. The repetition in some images raises no reasonable probability that the photographs unfairly influenced the jury's verdict. The admission of photographs was not reversible error, and did not deny the Appellant a fair and impartial trial. Proposition Five is therefore denied.
¶72 In Proposition Six, Appellant argues that the trial court's limitations on his testimony denied his Sixth Amendment right to present a defense. Appellant points to the fact that he testified in the narrative and without direct examination by his counsel, and on a few occasions, the trial court redirected him to give his account of what happened on the day of the alleged murder. He argues this unconstitutionally excluded important testimony about the motive of the third party he identified as the real killer, as well as the facts of a drug deal that happened on a different day.
¶73 The state and federal constitutions guarantee a criminal defendant the meaningful opportunity to present a complete defense, including the right to "present his own version of events in his own words." Rock v. Arkansas, 483 U.S. 44, 51-52 (1987) (finding this right "[e]ven more fundamental to a personal defense than the right of self-representation"). However, the right to testify, like the right to present other defense witnesses, remains subject to reasonable regulation under established procedural and evidentiary rules. Gore v. State, 2005 OK CR 14, ¶ 21, 119 P.3d 1268, 1275 (citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973)).
¶74 The record reflects that during an in camera hearing, in response to Appellant's question about how far back his trial testimony could go, the court indicated the Appellant should testify about the events on the day of K.B.'s death. Appellant asked if he could testify about the previous day, May 17th, and the trial court told him to tell the jury "whatever you saw happen to [K.B.] that day," but not to speculate about matters beyond his personal knowledge, such as "who, maybe God, or [Jeremy] Walker or something did something to him on the 17th."
¶75 Appellant asked the court about other witnesses who would say he and Jeremy Walker "hung out . . . that we were around each other and that we knew each other, is that not probable cause of him being a suspect, even though it was back so far?" The court replied that Appellant could testify that he and Walker had hung out, "but there's no [other] witnesses here. So you can only tell your personal story, your personal knowledge." Appellant then asked if he could reference a different "drug deal gone wrong" as the reason Jeremy Walker would kill the child.
¶76 The court instructed Appellant that he could not say why someone else would do something, due to his lack of personal knowledge, but he could testify to a drug deal with Walker on the day of K.B.'s death. The prosecutor was concerned that Appellant had misunderstood the court to say he was limited to a specific day or time. The court then clarified that Appellant wanted to testify that Walker had killed K.B. after doing a drug deal, while Appellant was in the bathroom, which proved to be his actual testimony. When the court asked whether the deal was on the day of the murder or the previous day, Appellant said, "That day." On cross-examination, Appellant testified that he had known Jeremy Walker for a long time and had sold drugs to him on many other occasions.
¶77 The real question presented here is whether the trial court's instructions directing the Appellant to avoid arguably tangential subjects, potential hearsay, or matters beyond his personal knowledge, and focus his testimony on the day when the child was injured and died, denied Appellant a fundamentally fair trial by excluding relevant evidence that could have resulted in his acquittal.
¶78 Viewing the trial court's rulings within the context of the Appellant's direct testimony and cross-examination, as well as the remaining trial evidence, we find that the trial court did not unfairly exclude evidence of Appellant's innocence. The trial court's directions were generally grounded in the rules of evidence against speculation, relating inadmissible hearsay, or lack of foundation from the witness's personal knowledge, and were not an abuse of discretion. We also infer that any testimony excluded by these rulings creates no reasonable probability of a different outcome, and did not prejudice Appellant's right to present a complete defense. Proposition Six is denied.
¶79 In Proposition Seven, Appellant argues that expert testimony on the ultimate issue denied him a fair trial. The State presented expert testimony by Dr. Brown, one of the treating physicians, that the amount of force necessary to inflict the victim's injuries would not be reasonable to a "rational adult." The State also elicited Dr. Brown's agreement with the expert opinion of Dr. Stuemky that the victim was a "beaten child" who died from intentional abuse. Dr. Brown also agreed that no "reasonably functioning" person would make "a conscious decision to wait" to seek emergency help for a child with these injuries.
¶80 The Oklahoma Evidence Code provides that testimony from a qualified expert about "scientific, technical or other specialized knowledge" that will "assist the trier of fact to understand the evidence or to determine a fact in issue," is admissible if "based upon sufficient facts or data" derived from the proper application of reliable "principles and methods" applied to the facts of the case. 12 O.S.2011, § 2702.
¶81 Trial counsel raised no objection to the challenged testimony at trial, waiving review for all but plain or obvious error, as defined above. Simpson, 1994 OK CR 40, ¶ 2, 876 P.2d at 692-93. He must therefore show that this testimony was admitted in plain or obvious violation of section 2702 or other controlling law. From our review, this testimony was based on the witness's specialized knowledge, training, and experience in medicine and the diagnosis and treatment of child abuse. His conclusions were derived from the facts of the case as he observed them during his treatment of the victim, as well as his consideration of the opinions of another recognized expert in the child abuse diagnosis and treatment.
¶82 Contrary to Appellant's argument, the testimony of Dr. Brown did not "merely tell[] a jury what result to reach," but rather shared with the trier of fact his informed inferences from the facts based on years of specialized medical training and experience. Mitchell v. State, 2006 OK CR 20, ¶ 67, 136 P.3d 671, 700. Moreover, considering Appellant's own testimony that the victim was "aggressively killed and murdered" by someone else, and his admission that he waited too long to call 911, we fail to see how Appellant's defense could be unfairly prejudiced by this evidence. Appellant has failed to show a plain or obvious error that affected the outcome of the trial. Proposition Seven is denied.
¶83 Appellant argues in Proposition Eight that the trial court erred by denying trial counsel's repeated mid-trial requests for a hearing to determine Appellant's competency to stand trial. The Oklahoma Statutes and the Due Process Clause of the Fourteenth Amendment provide that no person shall be subjected to a trial or other criminal proceedings while incompetent. 22 O.S.2011, § 1175.2(A); Cooper v. Oklahoma, 517 U.S. 348, 354 (1996). A defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960); 22 O.S.2011, § 1175.1(1).
¶84 The defendant in a criminal prosecution is presumed by statute to be competent to stand trial until the contrary is shown by a preponderance of evidence. 22 O.S.2011, § 1175.4(B). To initiate a judicial inquiry into present competency, either the defendant, defense counsel, or the prosecutor must file an application alleging that the defendant is incompetent, which "shall state facts sufficient to raise a doubt as to the competency of the person." 22 O.S.2011, § 1175.2(A). The court itself may also commence such an inquiry based on its own doubt concerning the defendant's present competency. Id.
¶85 Competency-to-stand-trial issues can implicate both substantive and procedural due process rights. Walker v. Attorney General, 167 F.3d 1339, 1343-44 (10th Cir. 1999). The trial court's refusal to hold a hearing, or an adequate hearing, in the face of facts raising a doubt of present competency, violates procedural due process, while the actual trial and conviction of a mentally incompetent defendant is a violation of substantive due process. Smith v. Mullin, 379 F. 3d 919, 930 (10th Cir. 2004).
¶86 Appellant here raises a claim of procedural due process, alleging that the trial court failed to give proper weight to facts that met the necessary threshold to suspend the ongoing trial for at least a hearing on the application as required by section 1175.3(A)-(C). That threshold, of course, is that the application must state "facts sufficient to raise a doubt as to the competency of the person." § 1175.2(A).
¶87 Trial judges must always be "alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial," Drope v. Missouri, 420 U.S. 162, 181 (1975), and such questions "may surface at any time during the trial proceedings." Gilbert v. State, 1997 OK CR 71, ¶ 16, 951 P.2d 98, 106. When the question of competency is raised during trial, the court's ruling on whether a bona fide doubt has been shown is reviewed for an abuse of discretion, as defined above. Grant, 2009 OK CR 11, ¶ 9, 205 P.3d at 8.
¶88 On the fifth day of trial, defense counsel applied for a determination of the Appellant's competency, referencing conversations with the Appellant that morning indicating Appellant was delusional, did not understand what was going on in the courtroom, and could not rationally assist in his defense. The court then inquired of the Appellant whether he was understanding the proceedings, and if Appellant felt that he was delusional. Defense counsel then questioned the Appellant, eliciting Appellant's belief that God had told him he would be acquitted, and that he was also receiving communications from his deceased brother.
¶89 The trial court found insufficient doubt to suspend the trial, and denied the application. The court also denied defense counsel's subsequent motion for a mistrial. Later the same day, defense counsel argued that the application could be decided only after the court formally set the matter for hearing and allowed the presentation of "additional evidence." The State opposed this argument by marking and offering a recorded phone call (Court's Exhibit 27) between Appellant and another person.
[2]
¶90 The defense again pressed for a further opportunity to present evidence. The trial court declined, noting that the case was in its "third year," that the question was preserved for appeal, and "We're going to proceed to trial." The trial court overruled another defense motion for mistrial and granted counsel a continuing objection to its ruling. The court then observed that "there's nothing to indicate Mr. Davison is incompetent . . . Saying that you talk to God or God talk[s] to you or if you talk to your dead brother does not suggest that you are incompetent in any way." The court noted that the Appellant had previously trifled with the court about whether he would enter a guilty plea, and expressed it's view that "it's this game he's playing with (sic) that I have a problem with . . . I'm not going to postpone this trial so that somebody can take a look at him."
¶91 Three days later, defense counsel filed another application for determination of competency, stating that events over the weekend had made it "abundantly clear" that Appellant was no longer competent to continue with the trial. The trial court allowed counsel to inquire of the Appellant, who testified that God had told him to go to trial, "to go against you, my family, everyone . . . to go against all, just stand in his name." Appellant affirmed his belief that Jeremy Walker was the real killer and that he would be acquitted. He testified that he had foreseen the outcome of the trial. Appellant agreed with counsel that no matter what he had been advised about the penalty phase, "If it's God's will, it's God's will."
¶92 We find no abuse of the trial court's discretion or denial of due process. In response to defense counsel's claims that Appellant was delusional, the trial court inquired whether Appellant understood the proceedings and felt his own mental state allowed him to proceed. The court found no impairment of his basic understanding of the nature and purpose of the trial or his need to make a defense. Appellant's belief that he was in communication with God or other spirits who had assured him of deliverance, or to whom he had surrendered his fate, is nothing new in the annals of jurisprudence; and was not, of its own force, a strong reason for the trial court to doubt that Appellant was then competent to stand trial.
¶93 The trial court reasonably concluded that the facts raised insufficient doubt of present competence to suspend the proceedings. There was no abuse of the trial court's discretion in the denial of a further competency evaluation. Moreover, we reject the premise that Appellant was denied any required "hearing" on his various applications to suspend the trial and litigate present competency. The court duly entertained these requests, denying them only after assuring itself that the facts were insufficient to doubt that Appellant was presently competent. This procedure was proper, and the results were neither clearly erroneous nor contrary to the logic and effect of the facts presented. Proposition Eight is therefore denied.
¶94 In Proposition Nine, Appellant argues that the trial court's question to Appellant in front of the jury confirming that he was testifying against the advice of his counsel denied his right to present his defense and due process of law, and deprived him of a fair and impartial trial. Trial counsel raised no objection to the comments challenged on appeal, waiving all but plain or obvious error as defined above. The verbal exchange between the court and the Appellant now assigned as reversible error is as follows:
The Court: Mr. Davison, I understand that you want to testify; correct? 
Appellant: Yes.
The Court: And that's against the advice of your counsel; correct? 
Appellant: Yes.
¶95 Appellant reasons that there was "no need" to confirm, in the presence of the jury, that Appellant was testifying against the advice of counsel. Appellant also insists that even if the trial court's question "did not flat out tell the jury that defense counsel believed Mr. Davison's testimony was going to be a lie," the question "undeniably informed the jury that something was wrong with" Appellant's testimony; and because Appellant was his only witness, "there was a problem with his entire defense."
¶96 Aside from citations to cases recognizing his general right to present a defense, Appellant cites no controlling case law for the proposition that the trial court's question was plainly or obviously in error. This Court has adhered to the principle that "so long as a trial judge does not indicate to the jury his views of the issues in contention, he possesses considerable latitude" in conducting the trial, including "the right to question a witness for the purpose of clarifying testimony," as well as "the right to interrupt an improper line of questioning." Brown v. State, 1973 OK CR 109, ¶ 14, 506 P.2d 1396, 1399.
¶97 We find the trial court's question probably indicated to the jury (in a relatively neutral way) exactly why Appellant was testifying in the form of a narrative and without the assistance of trial counsel. We do not accept counsel's supposition that this question unfairly telegraphed to the jury the trial court's view that there was something "wrong" with either Appellant's decision or the truth of his testimony. The question actually emphasized that it was properly Appellant's decision to testify, and that he was doing so without the approval or assistance of his counsel. In this way, the trial court's question may have actually benefited Appellant, which seems to have been its intent. Appellant has definitely not shown that the question was so plainly or obviously erroneous that the trial court should have known not to ask it.
¶98 Appellant has also failed to show that the question could have affected the outcome of the trial. The jury had also heard evidence of several conflicting statements from the Appellant about the events on the day of K.B.'s death, including statements in which he admitted some personal role in inflicting the injuries and neglecting to seek emergency assistance. The direct and circumstantial evidence of Appellant's involvement in K.B.'s death was substantial, even overwhelming. We find the strong evidence of guilt, rather than the trial court's brief clarifying question about Appellant's testimony, ultimately explains the jury's verdicts in this case. Proposition Nine requires no relief.
¶99 In Proposition Ten, Appellant challenges the sufficiency of the evidence to prove the statutory aggravating circumstance of a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. This Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the existence of the alleged aggravating circumstance beyond a reasonable doubt. Grissom, 2011 OK CR 3, ¶ 61, 253 P.3d at 990.
¶100 The State may prove the continuing threat aggravating circumstance "through the introduction of Judgments and Sentences showing a history of violent criminal behavior or through the introduction of additional evidence detailing the defendant's participation in other unrelated crimes, or both." Malone v. State, 1994 OK CR 43, ¶ 39, 876 P.2d 707, 717-18 (footnotes omitted). The aggravator may also be established by evidence of the offender's lack of remorse or the sheer callousness of the crime itself. Id.
¶101 In the light most favorable to the State, the crime itself involved tremendous violence against a defenseless victim who had been left in Appellant's care. Appellant later offered multiple false statements to cover up his criminal acts, demonstrating a callous and remorseless state of mind. He attempted at one point to escape his restraints and assaulted a detention officer during transport, showing a continued willingness to use violence. Other evidence showed Appellant had engaged in domestic violence, a history of drug abuse, callousness, and lack of remorse (e.g., saying in a phone call after the crime that he had tried to save his ex-girlfriend's "fucking child.") Any rational factfinder could conclude beyond a reasonable doubt that Appellant's violence "has demonstrated a threat to society," and "a probability that this threat will continue to exist in the future." OUJI-CR(2d) No. 4-74; 21 O.S. 2011, § 701.12(7). The evidence was legally sufficient to support the jury's finding of this aggravating circumstance. Proposition Ten is denied.
¶102 In Proposition Eleven, Appellant argues that the statutory aggravating circumstance that the murder was especially heinous, atrocious, or cruel is too vague and overbroad to perform the narrowing function on capital sentencing discretion required by the Eighth Amendment. We have repeatedly rejected this claim and do so again here. Martinez, 2016 OK CR 3, ¶ 67, 371 P.3d at 1116; Postelle v. State, 2011 OK CR 30, ¶ 84, 267 P.3d 114, 144. Proposition Eleven is denied.
¶103 In Proposition Twelve, Appellant raises a number of claims previously rejected in similar cases, urging the Court to reconsider. Appellant argues that (1) sentencing-phase jury instructions diminished the effect of mitigating evidence; (2) the trial court should have instructed jurors that they could consider life or life without parole after finding an aggravating circumstance; (3) the instructions permitted the jury to weigh aggravating circumstances against individual mitigating circumstances in violation of statute as well as the Eighth and Fourteenth Amendments; and (4) victim impact evidence has no place in Oklahoma's capital sentencing scheme. This Court has repeatedly rejected substantially similar arguments. Mitchell v. State, 2010 OK CR 14, ¶¶ 120-23, 235 P.3d 640, 664 (rejecting the same or similar previously adjudicated capital claims). We decline to revisit those rulings here. Proposition Twelve requires no relief.
¶104 In Proposition Thirteen, Appellant contends that the cumulative effect of individually harmless errors warrants reversal of his conviction or a modification of his death sentence. We have found no individually harmful errors, and further find no accumulation of prejudicial effects from individually harmless errors. Bench, 2018 OK CR 31, ¶ 226, 431 P.3d at 981. No relief is warranted. Proposition Thirteen is denied.
MANDATORY SENTENCE REVIEW
¶105 The Oklahoma Statutes, at 21 O.S.2011, § 701.13(C), require this Court to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supports the finding of statutory aggravating circumstances. We find no grounds for reversal or modification of the verdict of guilt or sentence of death.
DECISION
¶106 The judgment and sentence is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020), the MANDATE is ORDERED issued upon the delivery and filing of this decision. 
 
APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE CINDY H. TRUONG, DISTRICT JUDGE





APPEARANCES AT TRIAL

APPEARANCES ON APPEAL


MELANIE FREEMAN-JOHNSON
JAMES ROWAN
320 ROBERT S. KERR, STE. 400
OKLAHOMA CITY, OK 73102
ATTORNEYS FOR DEFENDANT

MARVA BANKS
320 ROBERT S. KERR, STE. 400
OKLAHOMA CITY, OK 73102
ATTORNEY FOR APPELLANT


GAYLAND GIEGER
KELLY COLLINS
ASST. DISTRICT ATTORNEYS
320 ROBERT S. KERR, STE. 505
OKLAHOMA CITY, OK 73102
ATTORNEYS FOR THE STATE

MIKE HUNTER
ATTORNEY GENERAL
JENNIFER J. DICKSON
ASHLEY L. WILLIS
ASST. ATTORNEYS GENERAL
313 N.E. 21ST STREET
OKLAHOMA CITY, OK 73105
ATTORNEYS FOR APPELLEE
 
OPINION BY: LEWIS, P.J.
KUEHN, V.P.J.: Concur
LUMPKIN, J.: Concur
HUDSON, J.: Concur
WINCHESTER, J.: Concur
FOOTNOTES
[1] See Rule 3.3, Oklahoma Rules of Professional Conduct, 5 O.S.2011, Ch. 1, App. 3-A (generally prohibiting a lawyer from offering "evidence that the lawyer knows to be false"); and Comment (noting some jurisdictions have allowed counsel to present the defendant as a witness or have him give a narrative statement even if counsel knows that the statement is false); see also Nix v. Whiteside, 475 U.S. 157, 174 (1986) (holding the right to counsel includes no right to the assistance of counsel in a plan to commit perjury; counsel's admonition to client not to give false testimony was not ineffective assistance under Strickland).
[2] In this call, Appellant and the third party spoke about what was happening at the trial, some things Appellant found confusing, Appellant's uncertainty about how his testimony would turn out, and so forth. Appellant stated during the call that after he gave his testimony, he would be cross-examined by the prosecutor.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1994 OK CR 40, 876 P.2d 690, SIMPSON v. STATE
Discussed at Length
 1994 OK CR 43, 876 P.2d 707, MALONE v. STATE
Discussed
 1995 OK CR 36, 900 P.2d 431, SPEARS v. STATE
Discussed
 2001 OK CR 1, 19 P.3d 294, 72 OBJ 371, HOOKS v. STATE
Discussed
 2005 OK CR 14, 119 P.3d 1268, GORE v. STATE
Discussed
 2006 OK CR 7, 130 P.3d 287, ROJEM v. STATE
Discussed
 2006 OK CR 17, 134 P.3d 150, JONES v. STATE
Discussed
 2006 OK CR 8, 134 P.3d 816, BROWNING v. STATE
Cited
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed
 2006 OK CR 20, 136 P.3d 671, MITCHELL v. STATE
Discussed
 2007 OK CR 9, 155 P.3d 796, HANCOCK v. STATE
Discussed
 2007 OK CR 12, 157 P.3d 143, GLOSSIP v. STATE
Discussed
 2007 OK CR 29, 164 P.3d 208, EIZEMBER v. STATE
Discussed at Length
 2009 OK CR 1, 201 P.3d 869, JONES v. STATE
Discussed
 2009 OK CR 11, 205 P.3d 1, GRANT v. STATE
Discussed at Length
 2009 OK CR 15, 207 P.3d 385, ROJEM v. STATE
Discussed
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed
 2010 OK CR 14, 235 P.3d 640, MITCHELL v. STATE
Discussed
 2011 OK CR 3, 253 P.3d 969, GRISSOM v. STATE
Discussed at Length
 2011 OK CR 30, 267 P.3d 114, POSTELLE v. STATE
Discussed
 2016 OK CR 3, 371 P.3d 1100, MARTINEZ v. STATE
Discussed
 2017 OK CR 10, 400 P.3d 834, BOSSE v. STATE
Discussed
 2018 OK CR 10, 421 P.3d 890, NICHOLSON v. STATE
Discussed
 2018 OK CR 15, 422 P.3d 752, WILLIAMSON v. STATE
Cited
 2018 OK CR 31, 431 P.3d 929, BENCH v. STATE
Discussed at Length
 2020 OK CR 16, KNAPPER v. STATE
Cited
 1973 OK CR 109, 506 P.2d 1396, BROWN v. STATE
Discussed
 1997 OK CR 71, 951 P.2d 98, 68 OBJ 3891, Gilbert v. State
Discussed
 1998 OK CR 62, 992 P.2d 332, 69 OBJ 3903, Young v. State
Discussed
 1999 OK CR 38, 989 P.2d 1017, Phillips v. State
Discussed at Length
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2401, Relevant Evidence Defined
Cited
 12 O.S. 2402, Relevant Evidence Generally Admissible - Irrelevant Evidence Inadmissible
Cited
 12 O.S. 2403, Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Cumulative Nature of Evidence
Discussed at Length
 12 O.S. 2702, Testimony by Experts
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.12, Aggravating Circumstances
Cited
 21 O.S. 701.13, Review of Death Penalty Sentence
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 1175.1, Definitions
Cited
 22 O.S. 1175.2, Application for Determination of Competency - Service - Notice - Suspension of Criminal Proceedings
Discussed
 22 O.S. 1175.4, Post-examination Competency Hearing - Evidence - Presumptions - Jury Trial - Presence of Accused - Witnesses - Instructions
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA